Filed 7/20/15  (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OMAR BERMUDEZ,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>FAITH CIOLEK,<br><br>  Defendant and Appellant;<br><br>NATHAN HEACOX,<br><br>  Defendant and Respondent. | G049510<br><br>(Super. Ct. No. 30-2012-00539759)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed herein on June 22, 2015, be modified as follows:

On page 31, lines 6 and 7 from the top of the page, delete "as stated in footnote 7 of this opinion" and insert in its place "as stated in footnote 6 of this opinion."

The petition for rehearing is DENIED.

The modification does not change the judgment.

IKOLA, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MOORE, J.

Filed 6/22/15  (unmodified version)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OMAR BERMUDEZ, | |
| Plaintiff and Respondent, | G049510 |
| v. | (Super. Ct. No. 30-2012-00539759) |
| FAITH CIOLEK, | O P I N I O N |
| Defendant and Appellant; | |
| NATHAN HEACOX, | |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Thierry Patrick Colaw, Judge.  Affirmed as modified.

Veatch Carlson, Peter H. Crossin and Bruce Schechter; Greines, Martin, Stein & Richland, Robert A. Olson, Gary D. Rowe and Edward L. Zanders for Defendant and Appellant Faith Ciolek.

Gibson & Hughes and Robert B. Gibson; The Simon Law Group, Robert T. Simon, Brad M. Simon and Jill P. McDonell for Plaintiff and Respondent Omar Bermudez.

Law Offices of Cleidin Z. Atanous and Cleidin Z. Atanous for Defendant and Respondent Nathan Heacox.

\*          \*          \*

Two vehicles collided at an intersection in Fountain Valley on the afternoon of January 11, 2012. The accident occurred sometime during the traffic light transition from green to yellow to red in the east-west lanes of Talbert Avenue. Westbound defendant Faith Ciolek began a left turn onto Bushard Street. Eastbound defendant Nathan Heacox entered the intersection, intending to proceed straight through. Following the collision, Heacox's car veered to the southeast corner of the intersection, striking plaintiff Omar Bermudez, who was on the sidewalk astride his bicycle. At the time of the collision, Bermudez apparently had no medical insurance.

In a special verdict, the jury found both defendants were "negligent" but concluded only Ciolek was "a substantial factor in causing harm" to Bermudez. Ciolek was therefore found to be responsible for 100 percent of Bermudez's $3,751,969 in damages. Ciolek asserts the verdict is inconsistent. We disagree. The jury was entitled to conclude that Heacox slightly exceeded a reasonable speed when he entered the intersection but that his speed was not a substantial factor in causing Bermudez's injuries.

Alternatively, Ciolek claims she is entitled to a new trial on damages because there is insufficient evidence of the reasonable value of Bermudez's medical damages in the record. Citing *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*), Ciolek faults Bermudez (an uninsured plaintiff, unlike the insured plaintiff in *Howell*) for relying on the amount of medical expenses incurred and expert testimony attesting to the fairness and reasonableness of the majority of those medical bills. Ciolek asserts Bermudez's experts needed to do more to establish that their testimony was rooted in the "market value" of medical services. We reject Ciolek's bid

for a new trial. But, because $46,175.41 of the judgment is not supported by substantial evidence, we reduce the damage award to $3,706,793.60 and affirm the judgment as modified.


CONSISTENCY OF SPECIAL VERDICT


"'[W]e review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] . . . ""'"Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error."'"'"" (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 585 (*David*).) "A special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357 (*Singh*).)


*Evidence at Trial*

The three parties, several percipient witnesses, and three accident reconstruction experts testified at trial. Key factual issues regarding Ciolek's potential negligence included the color of the light as she began her left turn, her attentiveness to traffic conditions in front of her, her reaction upon observing the approaching Heacox vehicle, and the position of her vehicle at impact. It appears the jury credited evidence tending to show Ciolek began her turn before the light turned red, Ciolek was not adequately monitoring the traffic in front of her, and Ciolek braked when she saw Heacox approaching, thereby blocking parts of both lanes of the intersection. Ciolek's appeal does not contest the sufficiency of the evidence for any of these propositions.

Instead, Ciolek focuses on the perceived inconsistency between the jury finding Heacox negligent with the finding Heacox's negligence was not a substantial factor in causing Bermudez's harm. Relatedly, Ciolek argues there is insufficient

3

evidence in the record to support the jury's finding that Heacox was not a substantial factor in causing Bermudez's harm. Key factual issues regarding Heacox's potential negligence included the color of the traffic light as he entered the intersection, the speed of his vehicle as he approached the intersection, his attentiveness to the conditions in front of him, and the extent and timeliness of evasive maneuvers (i.e., braking and swerving) taken by him.

The posted speed limit on Talbert Avenue was 45 miles per hour. Heacox testified he was exceeding the posted speed limit as he approached the intersection, adding, "If I have to take a percentage of that fault then that's on me." When Heacox saw the vehicle in front of Ciolek's vehicle turn left into the intersection, Heacox claims he was driving 55 miles per hour. At that point, he took his foot off the accelerator and placed it over the brake. By the time Heacox neared the intersection,[1] he claims he was driving 45 to 50 miles per hour. When Heacox saw Ciolek had entered and blocked the intersection, he began braking and swerving to the right. He collided with Ciolek's vehicle while driving approximately 45 miles per hour (according to his testimony).

Percipient witnesses' estimates of Heacox's speed as he approached the intersection varied. Bermudez opined that Heacox was travelling from 40 to 50 miles per hour. Ciolek opined it was more like 55 to 60 miles per hour. A driver waiting to turn left onto Talbert Avenue testified that Heacox's vehicle was moving at a "high rate of speed," "easily 40, 45." A pedestrian witness stated Heacox was at 40 to 50 miles per hour but was "speeding up" into the intersection.

The accident reconstruction experts had fairly close estimates of the speed of Heacox at impact: Bermudez's expert — 45 miles per hour; Heacox's expert — 48

---

[1] According to the driver of the first vehicle that turned left in front of Heacox, it took less than five seconds to complete his left turn and clear the intersection. He had to slow down during his turn to allow another car to complete a right turn in front of him, but then he sped up when he noticed Heacox approaching "much faster" than other cars.

miles per hour; and Ciolek's expert — 45.7 miles per hour. Bermudez's and Heacox's experts agreed that Heacox's stated speed of 50 miles per hour on approaching the intersection fit with their analyses, while Ciolek's expert opined that Heacox's speed approaching the intersection was "well in excess of 60 miles an hour." The differences in these analyses depended in part on assumptions about the amount of time Heacox braked before impact.

Heacox testified he was already entering the intersection by the time he perceived Ciolek to be turning. One expert opined that 1.1 to 1.6 seconds passed between the moment Heacox entered the intersection and the collision between the two cars. Expert testimony also established that it takes a typical person as much as 1.5 seconds to react to a new stimulus, and that Heacox was unable to stop or swerve sufficiently to avoid the collision in the time he had. According to the witness who observed the accident from the north as he waited to turn left, Heacox's veering maneuver was "as much as he possibly could [have done] in that short amount of time." An accident reconstruction expert opined that Heacox would not have been able to control his vehicle immediately after the impact with Ciolek's vehicle.

No evidence, whether expert testimony or otherwise, was presented to the jury concerning the effect of Heacox's speed before impact on the direction or speed of travel of Heacox's car after the collision with Ciolek. In other words, there was no attempt at trial to show Heacox's car would not have ricocheted into Bermudez had Heacox been driving slower, or to show Bermudez's injuries would have been less severe had Heacox been driving slower before impact.

*Jury Instructions and Verdict Form*

The court provided standard negligence instructions applicable to a motor vehicle accident (CACI Nos. 400, 401, 406, 411, 430, 700, 701). CACI No. 700 sets forth the basic standard of care for driving a vehicle: "A person must use reasonable care

5

in driving a vehicle. Drivers must keep a lookout for pedestrians, obstacles and other vehicles. They must also control the speed and movement of their vehicles. The failure to use reasonable care in driving a vehicle is negligence." CACI No. 430 described the causation element: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

The court also provided several instructions tailored to the question of Heacox's speed, including modified versions of CACI Nos. 706 and 707. "A person must drive at a reasonable speed. Whether a particular speed is reasonable depends on the circumstances, such as traffic, weather, visibility, and road conditions. Drivers must not drive so fast that they create a danger to people or property. [¶] If plaintiff has proved that defendant Nathan Heacox was not driving at a reasonable speed at the time of the accident, then defendant Nathan Heacox was negligent." "The speed limit where the accident occurred was 45 miles per hour. The speed limit is a factor to consider when you decide whether or not defendant Nathan Heacox was negligent. [¶] A driver is not necessarily negligent just because he or she was driving faster than the speed limit. However, a driver may be negligent even if he or she was driving at or below the speed limit."

The special verdict form asked the jury five basic questions: (1) was Heacox negligent; (2) was Ciolek negligent; (3) for each defendant, was their "negligence a substantial factor in causing harm to Omar Bermudez"; (4) what are Bermudez's damages (numerous lines for each category); and (5) "[w]hat percentage of responsibility for Omar Bermudez's harm do you assign to" each defendant?

6

*Argument of Counsel*

Bermudez's counsel summarized his view of the liability evidence: "Heacox entered on a yellow and was travelling 50 miles an hour. Very little he could have done to avoid the collision. Miss Ciolek made a left turn without checking for oncoming traffic." Counsel recommended a finding of negligence as to both defendants, but indicated he was not sure regarding causation as to Heacox. Counsel recommended Ciolek be held liable for 90 to 100 percent of damages, and Heacox be held liable for 0 to 10 percent of damages.

Counsel for Ciolek contended the evidence showed Heacox sped into the intersection on a red light and Ciolek did nothing wrong. He asked the jury to return a defense verdict for Ciolek and to hold Heacox liable for all damages. Counsel for Ciolek did not make an argument in the alternative about Heacox's speed necessarily playing some role in Bermudez's harm even if the jury found Ciolek was wholly responsible for the collision between the two cars.

Counsel for Heacox argued, "This accident was going to happen whether or not [Heacox] was going 40, 45, 50 or even slightly faster than that because Miss Ciolek was not paying attention. She failed to keep a lookout, which is what the instructions require under the Vehicle Code. She turned right in front of him and then puts her brakes on, stops and blocks his whole lane of travel." "[T]he evidence in this case shows that Miss Ciolek was the sole cause of this accident, and if she doesn't turn, there's no accident, by the way. If she doesn't turn, this never happens. Mr. Bermudez doesn't get hurt . . . ." Counsel for Heacox did not discuss whether Heacox's speed could have played a role in harming Bermudez even if the jury concluded Heacox's speed did not cause the collision between Heacox and Ciolek.

7

*Verdict, Judgment, and Motion for New Trial*

The jury found Heacox and Ciolek negligent, but also found only Ciolek's negligence was a substantial factor in causing harm to Bermudez. The jury, answering a separate question, assigned 100 percent responsibility for Bermudez's harm to Ciolek, and zero percent to Heacox. The jurors unanimously found Heacox's negligence was not a substantial factor causing harm, but (strangely) three jurors dissented from the assignment of zero percent fault to Heacox.

Ciolek timely moved for a new trial on multiple grounds, including her argument here that the special verdict findings were inconsistent in deeming Heacox negligent but not a substantial factor in causing Bermudez's harm. For the first time in this case, Ciolek argued that "as a matter of physics, plaintiff Mr. Bermudez's injuries were caused by Mr. Heacox's vehicle striking Ms. Ciolek's vehicle at a particular speed, causing it to then *ricochet* to the sidewalk, striking Mr. Bermudez with particular force, pushing him into a wall. Had Mr. Heacox been traveling at a slower, safer, lawful speed, the physical result of his vehicle's impact against Ms. Ciolek's vehicle would *necessarily* have been different, because the force, velocity, and even direction of his vehicle's ricochet would have been different." The court denied the motion.

*Analysis: Special Verdict Findings are Consistent*

Ciolek contends the special verdict findings are inconsistent. In a broad sense, the jury's findings are easy to reconcile: the jury found Heacox breached his duty of care in some way (i.e., a combination of excessive speed, a lack of optimal attention to the conditions around him, and/or an inappropriate response to the conditions at the intersection) that was not a substantial factor in causing harm to Bermudez. This is not a case in which the jury made inconsistent findings when answering two essentially identical factual questions pertaining to different theories of liability (e.g., *Kurtin v. Elieff* (2013) 215 Cal.App.4th 455, 479-481; *Singh*, *supra*, 186 Cal.App.4th at pp. 358-359) or

8

damages (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1086, 1093-1094; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682-684). The simple special verdict form in this case, with a single negligence cause of action against both defendants, admirably minimized the risk of such an obvious inconsistency arising.

Nevertheless, Ciolek suggests the jury's finding that Heacox breached his duty is logically inconsistent with a finding that his breach was not a substantial factor in Bermudez's harm. Heacox and Bermudez both assert there is no inconsistency. *David*, *supra*, 226 Cal.App.4th 578, the closest California case to the facts presented here, offers room for the parties to argue their respective positions.

In *David*, a jury found by way of special verdict that the defendant truck driver had breached his duty of care but his conduct was not a substantial factor in causing harm to plaintiffs. (*David*, *supra*, 226 Cal.App.4th at pp. 581, 585.) After the truck driver parked his northbound vehicle alongside the west edge of Pacific Coast Highway to rest, the truck driver turned back onto the northbound lane at twilight. (*Id*. at pp. 582-583.) Before the truck driver had the opportunity to complete the turn, a southbound vehicle drove into the end of the trailer in the southbound lane without braking; the plaintiffs (including the driver of the vehicle) were distracted by their attempt to play music on a laptop computer. (*Ibid*.) The record was silent with regard to the jury's belief as to how the truck driver was negligent. (*Id*. at pp. 585-586.)

Substantial evidence supported any of the following possible findings: (1) the truck had a nonfunctioning turn signal; (2) the trailer had improperly maintained reflector strips and lights on its side; and (3) the truck driver failed to survey his surroundings from an optimal position before turning back on the road. (*David*, *supra*, 226 Cal.App.4th at pp. 588-589.) These types of negligence did not necessarily have a causal impact on the collision. (*Id*. at pp. 586-587.) The jury did not make specific findings that the truck driver had illegally parked on the left side of the roadway or that

9

he failed to yield to plaintiffs' vehicle during the turn, findings which would be more difficult to square with the conclusion that his conduct was not a substantial factor in causing harm to plaintiffs. (*Id.* at pp. 587-588.) In sum, *David* rejected the idea that the jury's verdict was inconsistent because "[t]he jury could have reasonably concluded that the collision was caused by [plaintiff's] inattentiveness to the road ahead of him rather than any act of negligence committed by" the truck driver. (*Id.* at p. 588.) Some acts or omissions accurately classified as "negligent" (i.e., a breach of the defendant's duty of care) do not necessarily have a causal role in motor vehicle accidents.

But *David* ultimately reversed the defense judgment and remanded for a new trial. The trial court, in ruling on a new trial motion, found that the record compelled the conclusion that defendant was negligent per se in parking along the opposite side of the roadway in violation of Vehicle Code section 22502. (*David*, *supra*, 226 Cal.App.4th at pp. 589-592.) If the trial court was right about the evidence compelling this factual conclusion, it was necessarily wrong in deciding there was sufficient evidence to support a finding that the truck driver's negligence was not a substantial factor in causing the accident — the truck driver's entry back on to the northbound side of the road obviously played a causal role in the accident. (*Id.* at p. 591.) Though the trial court was not obligated to make any findings in ruling on the new trial motion, its finding on the record manifested an error of law. (*Id.* at pp. 590-592.) Hence, some negligence findings are inherently inconsistent with a finding of no causation, a principle Ciolek seeks to apply in this case (through either the inconsistent verdict or substantial evidence rubric).

Ciolek does not argue the jury's findings would have been irreconcilable with regard to a hypothetical finding concerning merely the *collision of the two cars* in this incident. It was reasonable for the jury to conclude (in agreement with Heacox's counsel during closing argument) the car collision would have occurred in the intersection regardless of whether Heacox was negligent. (See *Magee v. Coats*

10

(La.Ct.App. 1992) 598 So.2d 531, 535-537 [jury entitled to find driver speeding straight through intersection breached duty of care but was not a legal cause of the accident].)

But, according to Ciolek, the question of whether Heacox's negligence was a substantial factor in the collision of the two cars is in some sense a "red herring." The actual query to the jury was whether Heacox's negligence was a substantial factor in causing Bermudez's injuries, not the collision between the two defendants' vehicles. Any possible finding of negligence on the part of Heacox in this particular case is (in Ciolek's view) irretrievably irreconcilable with a finding of no causation as to Bermudez's harm. As in her new trial motion, Ciolek posits that the direction and speed of Heacox's *deflected* car was affected by the speed of Heacox when he made contact with Ciolek's vehicle in the intersection. Had Heacox been driving at the speed limit at all relevant times, and had he been paying optimal attention to the road (allowing him to brake and take evasive measures as early as possible), the collision between the vehicles and the ricochet of Heacox's vehicle would have been different. The jury's findings are supposedly irreconcilable because they ignore the laws of physics by which our universe is governed.

In connection with this contention, Ciolek requests we take judicial notice of "the laws of physics, specifically the law of conservation of momentum." Ciolek elaborates, "The law of conservation of momentum provides that in a collision, momentum is conserved; the combined momentum of two colliding objects going into the collision must equal the momentum coming out of it. The momentum of an object equals its mass multiplied by its velocity; velocity is a vector, which in turn is composed of both speed and direction." Ciolek attaches written materials explaining this principle with equations and examples.

Ciolek's argument is certainly interesting. Of course, it is not the argument she made at trial. At trial, she claimed Heacox was the sole cause of the collision (and therefore the harm to Bermudez). Ciolek did not ask the trial court to take judicial notice

11

of the law of conservation of momentum and to instruct the jury on its meaning. Ciolek did not ask her accident reconstruction expert to evaluate and opine on the effect of Heacox's speed on the ricochet.[2] Faced with a result she did not expect (though it was consistent with the result requested by Bermudez's counsel and Heacox's counsel in their closing arguments), Ciolek now suggests the jury reached an illogical verdict based on the supposed common sense of the law of conservation of momentum.

We reject Ciolek's request to essentially retry the case on appeal and we deny her request for judicial notice as irrelevant to the issues before us. "It is a firmly entrenched principle of appellate practice that litigants must adhere to the theory on which a case was tried. Stated otherwise, a litigant may not change his or her position on appeal and assert a new theory. To permit this change in strategy would be unfair to the trial court and the opposing litigant." (*Brown v. Boren* (1999) 74 Cal.App.4th 1303, 1316.) It would be fundamentally unfair to both Heacox and Bermudez to grant a retrial to Ciolek because she wants the chance to try a different theory the second time around.

Given the record actually developed at trial, it cannot be said that the special verdict was inconsistent or the findings made therein were not supported by substantial evidence. The jury's verdict strongly implies it found Heacox to be minimally

---

[2] Presumably, an expert witness would consider numerous factors (in addition to Heacox's speed) affecting the speed and direction of the ricochet. Factors might include road friction, braking force, and the amount of momentum absorbed through the crush of the vehicle bodies. The speed and direction of the ricochet of perfectly elastic billiard balls on a frictionless billiard table will not, without more, approximate the speed and direction of automobiles after a collision. Of course, Ciolek does not offer here to actually solve physics equations based on various assumed speed inputs. Instead, she simply insists the result of the crash must have been somehow different (and presumably worse) than in a counterfactual world in which Heacox was travelling at a nonnegligent speed. Ciolek does not consider the possibility that Bermudez could have been made worse off had Heacox been travelling slightly slower. This is theoretically possible (i.e., if Bermudez's body and Heacox's car had been in slightly different positions at the point of impact, perhaps Bermudez would have suffered more extreme injuries or even died).

negligent. We can infer Heacox was not far from a finding that he did not breach his duty of care. Perhaps he was driving a few miles per hour faster than was prudent and/or was not quite paying close enough attention to the conditions around him. The evidence certainly supports a finding that Heacox was slightly over the speed limit at the time he entered the intersection. But the jury's other findings indicate Heacox could not have avoided the collision even if he had exercised due care. This suggests the jury found Ciolek's negligence overwhelmed anything Heacox did or reasonably could have done. Bermudez had the burden of proving by a preponderance of the evidence all three elements of a negligence cause of action, including causation. No evidence was introduced suggesting that a small difference in Heacox's speed would exacerbate Bermudez's injuries. The jury concluded that Bermudez's burden was met with regard to Heacox as to breach of duty but not causation. Heacox's breach of his duty of care was not a *substantial* factor in causing Bermudez's injuries.

## DAMAGES AWARD

"Whether a plaintiff 'is entitled to a particular measure of damages is a question of law subject to de novo review. [Citations.] The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence.'" (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753.)

*Evidence at Trial*

At the time of the accident, Bermudez apparently had no medical insurance. He was taken by ambulance to University of California Irvine Medical Center (UCI), where he stayed four to five days. Bermudez sustained multiple injuries as a result of the collision, including: (1) a fractured patella (kneecap), for which surgery was necessary; (2) a fractured pelvis and a chip in his front left hip, which required multiple diagnostic

13

procedures; (3) severe shoulder injuries; (4) lacerations; and (5) deep bruising to his left leg and testicles. Debilitating pain after his initial convalescence lead to two separate back surgeries — a microdiscectomy to repair a herniated disc and a separate surgery to remove and replace the injured disc.

Defendants did not file motions in limine to exclude medical damages evidence. The following came into evidence without objection or motion to strike by either defense counsel.

Bermudez testified that the amount of his outstanding medical bills was approximately $450,000. He had not paid any of the bills. Bermudez believed his medical providers will be paid out of any recovery he receives in this case, but he will be responsible for the bills no matter what happens in the litigation.

The parties stipulated to the *admissibility* (not the reasonableness) of Bermudez's exhibit 239, a summary of past medical bills. The total of the past bills was $445,430.64. The parties also stipulated to the *reasonableness* (not just the admissibility) of $15,000 in recent medical charges not reflected in exhibit 239.

Experts for the parties testified regarding both the necessity of various procedures and the reasonableness of the charges for those procedures. Dr. William Van Der Reis, an orthopedic surgeon with a practice in Orange County, testified for Bermudez regarding his medical treatment, with the exception of the two back surgeries. Van Der Reis performs surgeries at two hospitals, as well as an outpatient surgery center. Van Der Reis examined Bermudez and reviewed the charges for his care and treatment. UCI charged $111,000 for Bermudez's hospital stay, which Van Der Reis agreed was "fair and reasonable." Van Der Reis similarly agreed that the physician fees for treatment at UCI (specified in exhibit 239) were "fair and reasonable." Van Der Reis testified that only some of the fees charged for magnetic resonance imaging (MRI) scans were fair and reasonable; he indicated a $6,150 scan should be reduced to $2,030 and a $8,346 scan should be reduced to between $2,000 to $2,500. In sum, Van Der Reis endorsed some of

14

the medical bill amounts not related to Bermudez's back as fair and reasonable, while discounting other medical bills to what he considered to be a fair and reasonable amount.

Van Der Reis also identified four charges Bermudez would incur in the future for an additional knee surgery to remove the plate inserted during the first knee surgery. These expected charges totaled $14,250. Van Der Reis opined Bermudez would benefit from cortisone injections ($300 to $350 per visit) and physical therapy ($1,500 for 12 sessions). Van Der Reis's testimony about future medical expenses was not linked to existing medical bills.

Dr. Fardad Mobin, a neurosurgeon who performed Bermudez's second back surgery, testified regarding Bermudez's back problems. Mobin maintains an active clinical and surgical practice in Los Angeles County. Mobin was familiar with reasonable and customary charges for spinal surgeries and related services. Mobin reviewed Bermudez's medical records. Mobin opined that charges for initial treatment ($1,820) were reasonable. Mobin opined that the first back surgeon's charge of $65,328 was too high because the cost for this type of surgery in his region was between $20,000 to $25,000. But Mobin stated the remainder of the charges for the first surgery were fair and reasonable: $69,500 for the surgical center, $483 for spinal X-rays, $3,250 for anesthesia, $323 for fluoroscopy, and $3,520 for postsurgery medical equipment. With regard to the surgery he performed, Mobin opined that the surgeon's fee ($50,176), anesthesiologist's fee ($3,976), MRI fee ($2,220), and the facility cost ($93,629) were reasonable and within the community standard. He noted these services were provided on a lien. Like Van Der Reis, Mobin endorsed some of the medical bills as fair and reasonable, while discounting other medical bills to what he considered to be a fair and reasonable amount.

As to future medical expenses, Mobin opined Bermudez would require an additional back surgery in the next 10 to 15 years at a total cost of between $160,000 and $180,000. Mobin also identified various other future medical costs pertaining to

15

Bermudez's back: pain management regime, including up to three epidurals per year costing $10,000 each; facet blocks in sets of two for a total of approximately $15,000; and consultations with a spine surgeon twice per year for four to five years (initial consult at $1,000 to $1,500, follow ups at $400 to $600). Bermudez should obtain annual X-rays ($150 per set), annual MRIs ($2,000 to $2,500), and two computed tomography (CT) scans ($2,000 each) in the next five years. Bermudez will need 16 to 18 physical therapy sessions for the next four to five years, at $100 to $150 per session. Mobin's testimony about future medical expenses was not linked to existing medical bills.

Bermudez's economist expert opined as to the present value of Bermudez's future medical expenses. Based on medical expert testimony and alternate assumptions concerning the growth of health care costs, he testified that ranges of either $582,190 to $816,770, or $691,013 to $984,650 would be incurred.

Dr. Michael Weinstein, an orthopedic surgeon called to testify by Ciolek, also testified regarding the reasonableness of Bermudez's medical costs. He opined that "[s]ome of the charges . . . were fine. All the charges from UCI, the surgeries [at UCI], I thought they were all fine." Weinstein disagreed with the necessity and reasonableness of the back surgeries and related costs. Even assuming the back surgeries were appropriate, Weinstein put the market value of the first back surgery at $1,200 to $3,000, and the market value of the facility fee at $6,000 to $12,000. The second surgery's market value was $6,000 to $8,000, with a facility fee of $20,000 to $25,000. Weinstein explicitly established his foundation for these opinions by describing his own practice and his knowledge of rates in his areas of practice, including the amounts he actually recovers from insurers or individuals who make cash payments.

16

*Jury Instructions and Argument of Counsel*

The jury was instructed with modified versions of CACI instructions pertaining to damages, including CACI Nos. 3900, 3902, 3903, 3903A, 3903C, 3903D, 3904A, 3905, 3905A, 3924, 3925, 3932, 3933, and 3964. For purposes of this appeal, CACI No. 3903A is most pertinent: "To recover damages for past medical expenses, plaintiff, Omar Bermudez, must prove the reasonable cost of reasonably necessary medical care that he has received. [¶] To recover damages for future medical expenses, plaintiff, Omar Bermudez, must prove the reasonable cost of reasonably necessary medical care that he is reasonably certain to need in the future."

After reviewing the evidence of damages in his closing argument, Bermudez's counsel requested $414,255.59 in past medical expenses; $691,000 to $984,000 for future medical expenses; $11,538 in past lost earnings; $442,400 to $815,000 in future lost earnings; $2,125,000 in past noneconomic losses ("I suggest to you it's worth far more than those economic losses that we've been talking about. Three times, four times, five times more than that because the damage to the person is what hurts us to the core."); and $5.5 million for future noneconomic losses.

Counsel for Ciolek contested the necessity and reasonableness of medical expenses, both past and future, in his closing argument. He put forth the following numbers as appropriate and supported by the evidence: $135,000 — past medical expenses; $12,000 (rounded up) — past lost earnings; and $90,000 for future lost wages. Counsel for Ciolek did not provide a number for future medical expenses or noneconomic damages.

Counsel for Heacox did not question the necessity of Bermudez's various surgeries. He did argue "some of the doctors" charged "a lot of money," "[m]ore than Dr. Weinstein thinks is right. But it's up to you to, again, weigh the credibility of those doctors. You've heard the arguments, good arguments on both sides."

17

*Verdict Form, Judgment, and Motion for New Trial*

The jury's special verdict indicated the following damages for Bermudez: past medical expenses — $460,431;[3] past lost earnings — $11,538; future medical expenses —$425,000; future lost earnings — $130,000; past noneconomic loss — $2 million; and future noneconomic loss — $725,000. Total damages equaled $3,751,969 and the court entered judgment against Ciolek accordingly.

One section of Ciolek's new trial motion classified the damages awarded to Bermudez as excessive because the past medical damage amounts were not based on market value. As previously noted, the court denied the new trial motion. The court stated on the record at the new trial hearing, "Frankly, I don't understand why he survived the accident. Probably one might consider him to have been easily killed in this accident. His injuries were . . . serious. [¶] He was badly injured. He is still badly injured. He is going to need more surgeries. And the jury's verdict was probably right on."

*Disentangling the Measure of Damages, the Admissibility of Evidence, and the Sufficiency of Evidence to Support a Judgment*

Ciolek argues a new trial on damages is necessary because Bermudez "failed to meet his burden of proving that his claims for past and future medical damages were reasonable, as measured by an exchange or market value" and because Bermudez "urged the jury to award noneconomic damages as a multiple of the improperly-grounded economic damages."

---

[3] The jury awarded more in past medical damages ($460,431) than requested by counsel for Bermudez ($414,255.59), who explained to the court while the jury was deliberating that he had adjusted his requested damages downward based on testimony by his own medical experts that certain amounts charged by treating physicians were excessive.

18

Three separate but related questions are pertinent to Ciolek's contentions: (1) what is the proper *measure of medical damages*; (2) what *evidence is admissible* to prove the proper measure of medical damages; and (3) what *evidence is sufficient to affirm* an award of medical damages based on the proper measure? We address each question in turn.

## A. *Proper Measure of Medical Damages*

Tort damages consist of "the amount which will compensate for all the detriment proximately caused" by the breach at issue. (Civ. Code, § 3333.) "Detriment is a loss or harm suffered in person or property." (Civ. Code, § 3282.) "Damages must, in all cases, be reasonable . . . ." (Civ. Code, § 3359.) The jury was properly instructed in this case to determine "the reasonable cost of reasonably necessary medical care that [Bermudez] has received" and "the reasonable cost of reasonably necessary medical care that [Bermudez] is reasonably certain to need in the future." But as a consequence of the discrepancy in recent decades between the amount patients are typically billed by health care providers and the lower amounts usually paid in satisfaction of the charges (whether by a health insurer or otherwise), controversy has arisen as to how to measure the reasonable costs of medical care in a variety of factual scenarios. Citing the collateral source rule, some plaintiffs suggested they should be entitled to recover the reasonable costs of medical care, even if that dollar value exceeded the amount actually paid in exchange for the medical services.

Our Supreme Court rejected this contention: "[A]n injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Howell*, *supra*, 52 Cal.4th at p. 566.) In other words, "a plaintiff may recover as economic damages *no more* than the reasonable value of the medical services received and is not entitled to recover the

reasonable value if his or her actual loss was less." (*Id.* at p. 555; see also *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1325-1326 (*Corenbaum*) ["Damages for past medical expenses are limited to the lesser of (1) the amount paid or incurred for past medical expenses and (2) the reasonable value of the services"].) *Howell*'s holding was in accord with pre-*Howell* case law on the question of the proper measure of damages involving plaintiffs with insurance. (See *Nishihama v. City and County of San Francisco* (2001) 93 Cal.App.4th 298, 306-309 (*Nishihama*); *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, 639-644 (*Hanif*).)

The ramifications of *Howell* on the proper measure of damages in a case brought by an *uninsured* plaintiff (who has not paid his bill) are less clear. En route to its holding, *Howell* observed, "The rule that medical expenses, to be recoverable, must be both incurred *and* reasonable [citations] applies equally to those with and without medical insurance." (*Howell*, *supra*, 52 Cal.4th at p. 559, fn. 6.) And *Howell* endorsed "a rule, applicable to recovery of tort damages generally, that the value of property or services is ordinarily its 'exchange value,' that is, its market value or the amount for which it could usually be exchanged." (*Id.* at p. 556, quoting Rest.2d Torts, § 911, com. h, pp. 476-477.)

But the holding in *Howell* ultimately depended upon the "paid or incurred" prong of the test, not the "reasonable value" prong. (*Howell*, *supra*, 52 Cal.4th at pp. 555-556.) Insured plaintiffs incur only the fee amount negotiated by their insurer, not the initial billed amount. Insured plaintiffs may not recover more than their actual loss, i.e., the amount incurred and paid to settle their medical bills. (*Id.* at p. 555.) It was not necessary in *Howell* to examine the mechanics of properly measuring damages in the case of an uninsured plaintiff. (*Ibid.*)

*Howell* certainly did not suggest uninsured plaintiffs are limited in their measure of recovery to the typical amount incurred by an insured plaintiff, or, for that matter, the typical amount incurred by any other category of plaintiff. *Howell* noted

20

"pricing of medical services is highly complex and depends, to a significant extent, on the identity of the payer. In effect, there appears to be not one market for medical services but several, with the price of services depending on the category of payer . . . ." (*Howell*, *supra*, 52 Cal.4th at p. 562.) *Howell* refused to "suggest hospital bills always exceed the reasonable value of the services provided. . . . [Citation.] With so much variation [in pricing], making any broad generalization about the relationship between the value or cost of medical services and the amounts providers bill for them — other than that the relationship is not always a close one — would be perilous." (*Id*. at pp. 561-562, fn. omitted.) *Howell* acknowledged that, all other factors being held equal, the amount recovered by an uninsured plaintiff may be higher than that recovered by an insured plaintiff: "There is, to be sure, an element of fortuity to the compensatory damages the defendant pays under the rule we articulate here. A tortfeasor who injures a member of a managed care organization may pay less in compensation for medical expenses than one who inflicts the same injury on an uninsured person treated at a hospital (assuming the hospital does not offer the person a discount from its chargemaster prices). But, as defendant notes, '[f]ortuity is a fact in life and litigation.'" (*Id*. at p. 566.)

*Howell* offered no bright line rule on how to determine "reasonable value" when uninsured plaintiffs have incurred (but not paid) medical bills. Ciolek is correct that the concept of market or exchange value was endorsed by *Howell* as the proper way to think about the "reasonable value" of medical services. But she is incorrect to the extent she suggests: (1) Bermudez is necessarily in the same market as insured healthcare recipients or wealthy healthcare recipients who can pay cash; or (2) *Howell* prescribes a particular method for determining the "reasonable value" of medical services.

This takeaway from *Howell* is consistent with a pre-*Howell* case involving uninsured plaintiffs who were hurt in an automobile accident and obtained medical care. (See *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288, 1291-1292 (*Katiuzhinsky*).) In

21

*Katiuzhinsky*, the healthcare providers secured a lien against any personal injury recovery by plaintiffs, then sold plaintiffs' accounts at a discount to a firm specializing in such transactions (MedFin). (*Id*. at pp. 1291-1293.) The trial court limited plaintiffs' recovery for medical care bills sold to MedFin to the amount MedFin paid for the accounts. (*Id*. at p. 1296.) The appellate court found error in the trial court's ruling because there was evidence plaintiffs remained liable for the full amount billed; MedFin's purchase of the accounts at a discount did not reduce the amount owed by plaintiffs. (*Id*. at pp. 1296-1297.) Plaintiffs should have been entitled to argue to the jury that "the amounts charged to and incurred by them . . . represented the reasonable value of the medical services provided." (*Id*. at p. 1298.) *Howell* did not disapprove of *Katiuzhinsky*; it explicitly distinguished the facts before it from *Katiuzhinsky*, noting *Howell* was "not a case . . . where the plaintiffs 'remain[ed] fully liable for the amount of the medical provider's charges for care and treatment.'" (*Howell*, *supra*, 52 Cal.4th at p. 557.)

In sum, the measure of medical damages is the lesser of (1) the amount paid or incurred, and (2) the reasonable value of the medical services provided. In practical terms, the measure of damages in insured plaintiff cases will likely be the amount paid to settle the claim in full. It is theoretically possible to prove the reasonable value of services is lower than the rate negotiated by an insurer. But nothing in the available case law suggests this will be a particularly fruitful avenue for tort defendants. Conversely, the measure of damages for uninsured plaintiffs who have not paid their medical bills will usually turn on a wide-ranging inquiry into the reasonable value of medical services provided, because uninsured plaintiffs will typically incur standard, nondiscounted charges that will be challenged as unreasonable by defendants.

*B. Admissibility of Evidence, Particularly the Billed Amount, to Prove Medical Damages*

Trial courts typically "enjoy '"broad authority"' over the admission and exclusion of evidence." (*Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1156 (*Greer*).)

22

Consistent with this principle, several pre-*Howell* cases held courts are not *required to exclude* evidence of the initial billed amounts of medical expenses, even when a lesser amount was subsequently accepted by the medical care providers as payment in full. (*Olsen v. Reid* (2008) 164 Cal.App.4th 200, 204; *Greer*, *supra*, 141 Cal.App.4th at p. 1157; *Nishihama*, *supra*, 93 Cal.App.4th at pp. 309; but cf. *Calhoun v. Hildebrandt* (1964) 230 Cal.App.2d 70, 73 [court did not err by excluding medical bills when no other evidence was offered to prove they were reasonable in amount, or that the billed procedures were necessary and attributable to the accident].)

For instance, in *Greer*, *supra*, 141 Cal.App.4th at page 1156, the tortfeasor contended the court erred in denying his motion in limine to exclude evidence of the full amount initially billed for the plaintiff's medical expenses. When it denied the motion in limine, the trial court ruled that "while a postverdict reduction of the jury's award of medical expenses might be justified, defendant could not prevent the jury from hearing evidence regarding reasonable medical costs for plaintiff's care in the first instance." (*Id.* at p. 1157.) The appellate court agreed: "*Nishihama* and *Hanif* stand for the principle that it is error for the plaintiff to *recover* medical expenses in excess of the amount paid or incurred. Neither case, however, holds that *evidence* of the reasonable cost of medical care may not be admitted. Indeed, *Nishihama* suggests just the opposite: Such evidence gives the jury a more complete picture of the extent of plaintiff's injuries. Thus, the trial court did not abuse its discretion in allowing evidence of the reasonable cost of plaintiff's care while reserving the propriety of a *Hanif/Nishihama* reduction until after the verdict." (*Ibid.*)

*Katiuzhinsky* — as discussed above, a case in which the plaintiffs were uninsured — held the trial court committed error by excluding evidence of medical charges. (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at pp. 1295-1296.) "The trial court's ruling did not merely preclude plaintiffs from recovering special damages for medical expenses above the discounted rate paid by MedFin, but kept the jurors from considering

23

the medical bills as *evidence* of the reasonable value of the medical services. This ruling was erroneous. . . . [¶] [R]egardless of whether defendants were entitled to a *Nishihama*-type *reduction* of the medical damage award, there was no basis in law to prevent the jurors from receiving evidence of the amounts billed, as they reflected on the nature and extent of plaintiffs' injuries and were therefore relevant to their assessment of an overall general damage award." (*Ibid.*)

In sum, prior to *Howell*, so long as there was independent evidence that the underlying medical procedures were made necessary by the tort at issue, there was little question as to the *admissibility* on relevance grounds of the amount plaintiffs were charged for medical services.[4] These cases implied that the amount initially billed is always "relevant" (Evid. Code, §§ 210, 350) to either the question of the amount incurred by the plaintiff or to the "reasonable" value of the services provided, even if the measure of damages is limited by a lower amount actually paid. Relevant evidence is presumptively admissible. (Evid. Code, § 351.)

In *Howell*, the trial court denied a motion in limine to exclude evidence of unpaid medical bills, but granted a posttrial motion to reduce the medical damage award to the amount actually paid by plaintiff and her insurer. (*Howell*, *supra*, 52 Cal.4th at pp. 549-550.) As discussed above, *Howell*'s holding essentially approved of this reduction

---

[4] There was always, of course, a potentially valid hearsay objection to documents evidencing the amount charged (i.e., medical bills). "Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made, or that the charges were reasonable." (*Pacific Gas & E. Co. v. G.W. Thomas Drayage Etc. Co.* (1968) 69 Cal.2d 33, 42-43 (*Drayage*).) The invoices in *Drayage* were admissible as corroboration for testimony that the invoices had been paid. (*Id*. at p. 43 ["If, however, a party testifies that he incurred or discharged a liability for repairs, any of these documents may be admitted for the limited purpose of corroborating his testimony [citations], and if the charges were paid, the testimony and documents are evidence that the charges were reasonable"].) Here, Bermudez testified that he had incurred approximately $450,000 in medical expenses. Apparently, rather than corroborating this testimony with every invoice, the parties sensibly stipulated to the admission of exhibit 239.

24

(though *Howell* suggested the proper procedure was to grant a new trial unless the plaintiff accepted a reduced judgment).  The proper measure of damages was the amount paid pursuant to the reduced rate negotiated by the plaintiff's insurance company.

Despite the motion in limine at the trial court, the admissibility of evidence was not strictly at issue in *Howell*.  Nevertheless, the court commented:  "It follows from our holding that when a medical care provider has, by agreement with the plaintiff's private health insurer, accepted as full payment for the plaintiff's care an amount less than the provider's full bill, evidence of that amount is relevant to prove the plaintiff's damages for past medical expenses and, assuming it satisfies other rules of evidence, is admissible at trial.  Evidence that such payments were made in whole or in part by an insurer remains, however, generally inadmissible under the evidentiary aspects of the collateral source rule.  [Citation.]  Where the provider has, by prior agreement, accepted less than a billed amount as full payment, *evidence of the full billed amount is not itself relevant on the issue of past medical expenses*.  We express no opinion as to its relevance or admissibility on other issues, such as noneconomic damages or future medical expenses.  (The issue is not presented here because defendant, in this court, conceded it was proper for the jury to hear evidence of plaintiff's full medical bills.)"  (*Howell*, *supra*, 52 Cal.4th at p. 567, italics added.)[5]

_____

[5] In the course of its analysis, *Howell* extensively discussed the complexities and oddities of health care services markets (*Howell*, supra, 52 Cal.4th at pp. 560-566), including the observation that "[b]ecause so many patients . . . pay discounted rates, hospital bills have been called 'insincere, in the sense that they would yield truly enormous profits if those prices were actually paid.'" (*Id*. at p. 561.)  *Howell* noted, "[I]t is not possible to say generally that providers' full bill represent the real value of their services, nor that the discounted payments they accept from private insurers are mere arbitrary reductions." (*Id*. at p. 562.)  "Given this state of medical economics, how a market value other than that produced by negotiation between the insurer and the provider could be identified is unclear." (*Ibid*.)  To be clear, these observations provide support for the court's statement that the full billed amount was not itself relevant to the issue of past medical expenses when the provider had accepted less pursuant to a prior agreement with an insurer.  But *Howell* did not actually hold that medical charges are

Seizing on the italicized language, a post-*Howell* case disagreed with pre-*Howell* cases regarding the admissibility of evidence of the amount charged for medical expenses. In *Corenbaum*, *supra*, 215 Cal.App.4th at pages 1320-1321, plaintiffs sued for injuries suffered in a motor vehicle accident. The trial took place before *Howell*. (*Corenbaum*, at pp. 1321-1323.) Defendant did not request the exclusion of evidence pertaining to the amount plaintiffs were billed for their medical care, but instead reserved the right to move posttrial to reduce medical damages to the amount actually paid. (*Id*. at p. 1321.) The trial court granted plaintiffs' motion to exclude evidence of the amount of medical charges actually paid by a collateral source. (*Ibid*.) "In accordance with the trial court's in limine rulings, the jury heard evidence of the full amounts billed for [plaintiffs'] past medical care and heard no evidence of the lesser amounts accepted by their medical providers as full payment pursuant to prior agreements with . . . private insurers." (*Id*. at p. 1322.) Defendant filed a postverdict motion to reduce the damages awarded "by the difference between the full amounts billed for past medical expenses and the amounts actually accepted by plaintiffs' medical providers as full payment for the services provided." (*Id*. at pp. 1322-1323.) The trial court, though expressing its view that the motion had merit, lost jurisdiction to rule on this motion by the passage of time. (*Id*. at p. 1323.)

Rather than seeking a mere reduction of the damage award on appeal, the *Corenbaum* defendant appealed on the grounds that the trial court erred by "admitting evidence of the full amounts billed for [plaintiffs'] medical care when the amounts accepted by their medical providers as full payment were less than the amounts billed." (*Corenbaum*, *supra*, 215 Cal.App.4th at p. 1324.) *Corenbaum* held that evidence of the full amount billed for past medical services was not relevant (and was therefore inadmissible) to prove past medical expenses, future medical expenses, and/or

---

inadmissible. Nor did it engage with or critique prior case law on this question.

noneconomic damages. (*Id*. at pp. 1328-1333.) The analysis was driven by the view that *Howell* "stated that the full amount billed by medical providers is not an accurate measure of the value of medical services." (*Corenbaum*, at p. 1326; see also *id*. at p. 1330; but see *Howell*, *supra*, 52 Cal.4th at p. 561 ["We do not suggest hospital bills always exceed the reasonable value of the services provided"].) Distinguishing *Katiuzhinsky*, *supra*, 152 Cal.App.4th 1288, *Corenbaum* observed that "the plaintiffs in that case, who apparently had no health insurance, remained fully liable to their medical providers for the full amount billed despite the providers' sale of their accounts to a medical finance company at a discount." (*Corenbaum*, at p. 1328, fn. 10.) The matter was remanded for a new trial as to compensatory damages. (*Id*. at pp. 1333-1334.) Offering guidance to the trial court for its retrial of the damages issue on remand, the court opined that evidence of the full amount billed for past medical services could not support an as yet unoffered expert opinion as to the reasonable value of future medical services. (*Id*. at pp. 1331-1332.)

Another post-*Howell* case involved a dispute between a hospital and insurers "over the reasonable value of the poststabilization emergency medical services provided by" the hospital to the insured patients. (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1264.) The trial court erred when it "precluded evidence of the various rates Hospital charges and accepts as payment. Reasonable value is market value, i.e., what Hospital normally receives from the relevant community for the services it provides. Hospital rarely receives payment based on its published charge master rates. Thus, in determining the reasonable value of the poststabilization services, *the full range of fees is relevant*. The scope of the rates accepted by or paid to Hospital by other payors indicates the value of those services in the marketplace." (*Id*. at p. 1277, italics added.) Although decided in a different legal context (i.e., pursuant to regulations applicable to hospitals and insurers lacking a preexisting contractual relationship), it is worth considering this case. In holding the

27

court erred by excluding all evidence other than the billed charges, i.e., "the highest amounts that are ever received for the services," the appellate court did not wall off any part of the "full range" as per se irrelevant. (*Id*. at pp. 1269-1270, 1277.)

Though raising a sufficiency of the evidence (rather than an admissibility of evidence) challenge, Ciolek attacks the evidence marshaled by Bermudez (in particular, the amount of medical expenses incurred and the use of those figures as a starting point by the expert witnesses). To be clear, however, neither *Howell*, *supra*, 52 Cal.4th 541, nor *Corenbaum*, *supra*, 215 Cal.App.4th 1308, holds that billed amounts are inadmissible in cases involving uninsured plaintiffs. Bermudez's uninsured status meant that billed amounts were relevant to the amount he incurred (unlike insured plaintiffs, who really only incur the lower amount negotiated by their insurer). The billed amounts are also relevant and admissible with regard to the reasonable value of Bermudez's medical expenses, at least according to the only case clearly addressing the issue in the context of uninsured plaintiffs. (*Katiuzhinsky*, *supra*, 152 Cal.App.4th at pp. 1295-1296.) The admissibility of the billed amount is consistent with the "full range of fees" being relevant in determining the reasonable value of services in the health care marketplace. (*Children's Hospital Central California v. Blue Cross of California*, *supra*, 226 Cal.App.4th at p. 1277.)[6]

---

[6] Of course, this case does not feature an insured plaintiff. But as a general matter, we express some reservations about *Corenbaum*, *supra*, 215 Cal.App.4th 1308 seemingly holding that the amount initially billed is per se inadmissible in cases of insured plaintiffs whose bills were paid in full for less than the initial billed amount. *Howell*, *supra*, 52 Cal.4th 541, and *Corenbaum* did not contemplate a battle over the reasonableness of the amount paid to settle the bill in full. Unless defendants stipulate to the reasonableness of the amount actually paid to settle in full the medical bill, it seems to us that, consistent with pre-*Howell* case law, evidence of the initial billed amount would be relevant to proving the reasonableness of the discounted amount that was actually paid.

28

*Sufficiency of the Evidence to Support Medical Damage Awards*

Two points about the sufficiency of evidence to support a judgment can fairly be taken from *Howell*. First, the amount paid to settle in full an insured plaintiff's medical bills is likely substantial evidence on its own of the reasonable value of the services provided. (See *Howell*, *supra*, 52 Cal.4th at p. 562 ["looking to the negotiated prices" is good way to seek "the exchange value of medical services"; "how a market value other than that produced by negotiation between the insurer and the provider could be identified is unclear"].) Second, consistent with pre-*Howell* law (see, e.g., *Latky v. Wolfe* (1927) 85 Cal.App. 332, 346-347, 352 [judgment reduced by $160 because there was no evidence of "reasonable value" for the billed amount]), initial medical bills are generally insufficient on their own as a basis for determining the reasonable value of medical services. Ensuing cases have held that a plaintiff who relies solely on evidence of unpaid medical charges will not meet his burden of proving the reasonable value of medical damages with substantial evidence.

*State Farm Mutual Automobile Ins. Co. v. Huff* (2013) 216 Cal.App.4th 1463 (*Huff*) was an interpleader action in which a motor vehicle injury victim contested a hospital's asserted lien right to a portion ($34,320.86) of the injury victim's tort recovery (a judgment including $232,708.80 in medical damages). (*Id*. at p. 1466.) In attempting to prove its claim pursuant to the Hospital Lien Act (Civ. Code, §§ 3045.1-3045.6), the hospital introduced an authenticated hospital bill with itemized charges; testimony that the injury victim had no insurance and had not paid his bill; testimony that the injury victim was on notice of the bill and the lien; and testimony that the injury victim had introduced evidence of the hospital's bill in his tort action. (*Huff*, at pp. 1466-1467.) This evidence was insufficient to support a judgment in the hospital's favor. The hospital was required to prove "the reasonable and necessary charges" (Civ. Code, § 3045.1) as part of its case-in-chief. (*Huff*, at pp. 1469-1470.) *Huff* held medical bills are insufficient evidence of the amount of the lien. (*Id*. at pp. 1471-1472.) The

29

hospital "introduced no evidence the charges in [victim's] hospital bill were reasonable or were for necessary treatment attributable to the motor vehicle collision." (*Id*. at p. 1472.) "The bill itself was based on the [hospital's] standard charges and thus 'is not an accurate measure of the value of medical services.'" (*Ibid*.) *Huff* did not suggest the amount the victim incurred was irrelevant and therefore inadmissible on the damages issue. Indeed, facts pertaining to this amount were accurately described as "evidence," albeit evidence insufficient to prove reasonable medical expenses. (*Id*. at pp. 1471-1472.)

Next came *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120 (*Ochoa*). Once again, plaintiffs were injured in a motor vehicle accident. (*Id*. at pp. 125-126.) There is no indication in the opinion that plaintiffs' medical bills had been paid in full, whether for the amount billed or for a lesser amount. Evidence of the amounts of the medical bills was admitted, but no evidence was admitted as to the reasonableness of those medical bills, thanks to a successful motion in limine by defendants to exclude evidence of reasonableness based on the lack of discovery produced on this issue. (*Id*. at pp. 127-128.) The jury returned a verdict awarding substantial medical damages. (*Id*. at p. 128.)[7]

After discussing *Howell*, *Corenbaum*, *Huff*, and a host of older cases, *Ochoa* concluded with three observations: (1) "an unpaid medical bill is not an accurate measure of the reasonable value of the services provided"; (2) "an unpaid medical bill is not evidence of the reasonable value of the services provided"; and (3) "evidence of unpaid medical bills cannot support an award of damages for past medical expenses." (*Ochoa*, *supra*, 228 Cal.App.4th at pp. 138-139.) It is difficult to precisely identify the holding in *Ochoa*, because its analysis and terminology conflated two related questions

---

[7] The procedural posture of *Ochoa* was unusual. Basically, no judgment was entered but the trial court granted a new trial based on several grounds. The appellate court held this order was void. Nevertheless, the appellate court offered guidance for proceedings upon remand, i.e., consideration of an updated new trial motion after proper entry of judgment. (*Ochoa*, *supra*, 228 Cal.App.4th at pp. 130-134.)

30

(as discussed herein, the *admissibility* of evidence and the *sufficiency* of evidence to support a judgment).[8] Uncontroversially, *Ochoa* holds that evidence of unpaid medical bills, without more, is not substantial evidence of the reasonable value of services provided. Less clear is whether *Ochoa* intended to say something about the admissibility of evidence pertaining to the amount of unpaid medical bills — if it did, we reiterate our critique of *Corenbaum*, *supra*, 215 Cal.App.4th 1308 as stated in footnote 7 of this opinion.

*All But $46,175.41 of the Judgment is Supported by the Record*

Ciolek argues Bermudez failed to prove the proper measure of damages, i.e., the reasonable value of his past medical costs, with substantial evidence. Ciolek attributes this evidentiary shortfall to Bermudez's alleged failure to present evidence pertaining to the market or exchange value of the services received.[9]

To reiterate, "[d]amages for past medical expenses are limited to the lesser of (1) the amount paid or incurred for past medical expenses and (2) the reasonable value

_____

[8] *Ochoa*, *supra*, 228 Cal.App.4th at page 139 repeatedly characterized facts tending to prove the amount of unpaid medical bills as "not evidence." But "'[e]vidence' means testimony, writings, material objects, or other things presented to the senses that are offered to prove the existence or nonexistence of a fact." (Evid. Code, § 140.) Clearly, testimony and documents tending to prove the amount of an unpaid medical bill are "evidence" if they are admitted at trial. One can state that such matter should be inadmissible (either at a particular trial or in every trial), or one can state that this evidence is insufficient to prove something at a trial (e.g., the reasonable value of medical services received). But to characterize something as "not evidence" when it clearly is evidence under the Evidence Code only confuses matters.

[9] It is undisputed (for purposes of appeal) that the record supports findings that all of the surgeries and other procedures performed on Bermudez were reasonably necessary and caused by Ciolek's negligence. The discussion in this section pertains to the reasonable value of medical services, not the separate question of whether the services should have been provided or were caused by the breach of duty at issue.

of the services." (*Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1325–1326.) Like insured plaintiffs, uninsured plaintiffs must introduce substantial evidence of both the amount incurred and the reasonable value of the services. The amount incurred sets a cap on medical damages. But unlike the amount paid pursuant to an insurer's negotiated rates, the amount incurred by an uninsured medical patient is not sufficient evidence on its own to prove the reasonable amount of medical damages.

Neither Bermudez nor anyone else (e.g., an insurer) had paid for Bermudez's medical expenses at the time of trial. Thus, the operative measure of damages was destined to be "the reasonable value" of the medical services as determined by the jury, rather than the amount incurred by Bermudez. The jury was properly instructed to determine "the reasonable cost of reasonably necessary medical care that he has received" and "the reasonable cost of reasonably necessary medical care that he is reasonably certain to need in the future."

Bermudez offered evidence of both the amount he incurred and the reasonable value of medical care received. Bermudez testified to the amount (approximately $450,000) he had been billed and for which (in his view) he was responsible. The parties stipulated to the admissibility of an exhibit detailing Bermudez's past medical charges ($445,430.64) and to the reasonableness of $15,000 in recently incurred medical expenses not listed in the exhibit. Bermudez's expert medical witnesses testified (without objection) to the fairness and reasonableness of the medical expenses incurred by Bermudez, up to $414,255.59, and also estimated the costs of future care (without reference to the current medical bills). Defense experts took issue with the necessity of the back surgeries and the reasonableness of the fees charged for the back surgeries and related expenses. But even Ciolek's expert and counsel agreed with the UCI hospital fees as proper (as well as other discounted amounts for procedures Ciolek thought were unnecessary or improper).

32

The jury awarded $460,431 in past medical damages. There is a logical basis for the award ($445,430.64 + $15,000 = $460,431). But the jury's verdict is nonetheless legally incorrect and not supported by substantial evidence because it awarded the full amount incurred by Bermudez, not the reasonable value of his past medical services (i.e., up to $414,255.59). There is no substantial evidence that the total amount incurred was the reasonable value of the services provided. "When the evidence is sufficient to sustain some but not all alleged damages, we will reduce the judgment to the amount supported by the evidence." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533; see also *id*. at pp. 538-539 [disposition modifying judgment].)[10] We therefore modify the judgment to reduce the amount of damages by $46,175.41.

Ciolek claims nothing other than the $15,000 stipulated to as reasonable by the parties and (perhaps) $50,000 certified as reasonable by her expert, Weinstein (i.e., damages for which Weinstein discussed his knowledge of market data as supporting his figures, not the UCI fees which Weinstein agreed with but did not provide a foundational basis for his agreement), are supported by substantial evidence. Relying on *Corenbaum*, *supra*, 215 Cal.App.4th at pages 1331-1332 (which suggested in dicta that the full amount billed cannot provide the basis for an expert opinion of the reasonable cost of future medical expenses in a case where the insurer paid the negotiated rate) and other post-*Howell* case law, Ciolek asserts that Bermudez's experts' classification of Bermudez's medical charges as reasonable was too terse and conclusory to amount to substantial evidence because the experts did not sufficiently make clear they were identifying the market or exchange value of these services. Ciolek reasons these experts

---

[10] Counsel for Bermudez offered to stipulate to a postjudgment reduction in the damages amount when it became clear (by way of a jury question) that the jury might award more than $414,255.59. Ciolek did not accept this offer, and has not sought this relief in her motion for new trial or in this appeal. We nevertheless provide this limited relief, as it is subsumed within Ciolek's broader request to reverse the judgment for insufficient evidence as to damages.

33

simply evaluated the medical bills based on their own vague, idiosyncratic sense of reasonableness.

We reject Ciolek's view that we must grant a new trial on damages or reduce the amount awarded to Bermudez beyond the $46,175.41 reduction acknowledged above. This is not a case in which Bermudez actually incurred a lower amount in medical costs than the initial billed amount. Nor is this a case in which Bermudez simply declared that the incurred amount was reasonable. Bermudez called two medical doctors to testify about the reasonable costs of procedures about which they were knowledgeable, including one expert who testified concerning the back surgery he performed himself. (Cf. *Ochoa*, *supra*, 228 Cal.App.4th at p. 141 [treating physician entitled to testify to "reasonable value of medical services that he or she provided"].) These experts did not merely rubber stamp all of the medical bills as reasonable; they identified lower numbers as reasonable in some cases. These doctors were qualified to provide expert opinions concerning the reasonable value of the medical costs at issue. This opinion testimony was based in part on the medical costs incurred by Bermudez and in part on other factors considered by the experts, including their own experiences treating patients. This was not purely speculative evidence without any basis in the real world (like, for instance, speculative lost profits expert testimony in a business dispute). Bermudez actually suffered severe injuries and underwent expensive medical treatment. The evidence presented was sufficient to support an award of $414,255.59 in past medical damages.

Though not framed in this fashion, Ciolek's real complaint is that expert opinion testimony about the reasonable cost of Bermudez's medical procedures should have been inadmissible because the experts did not sufficiently establish that their method of forming an opinion was linked to a market or exchange value of medical services.[11] (See, e.g., *Sargon Enterprises, Inc. v. University of Southern California*

_____

[11] Ciolek also notes reasons why these experts' opinions should not have been believed (e.g., Mobin had a financial incentive to overstate the reasonable value of his

34

(2012) 55 Cal.4th 747, 753 [trial court properly fulfilled gatekeeper role by excluding speculative expert testimony concerning lost profits].) For instance, in her opening brief, Ciolek states "there was no foundational testimony as to what actual market rates were."

But Ciolek is unable to pursue this argument on appeal because appropriate objections were not made below. (Evid. Code, § 353, subd. (a).) No motion in limine was filed. No objections or motions to strike were made, whether on grounds of relevance or lack of foundation. It would be inappropriate to speculate as to whether any hypothetical objection or motion should have been granted. (See Evid. Code, § 802 ["A witness testifying in the form of an opinion may state . . . the reasons for his opinion and the matter . . . upon which it is based . . . . The court in its discretion may require that a witness before testifying in the form of an opinion be first examined concerning the matter upon which his opinion is based"]; Evid. Code, § 803 ["The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion"].) For all we know, Bermudez's experts could have provided compelling testimony supporting their chosen method of determining the reasonableness of Bermudez's medical expenses for the market in which he was served. We leave the question of how courts should fulfill their gatekeeper role in a case like the instant one for an appeal in which the parties have actually litigated the issue at trial.

We likewise reject Ciolek's assertion that she is entitled to a new trial as to all damages because the jury's award of past medical damages was "fundamentally flawed" and Bermudez's counsel asked the jury to base noneconomic damages on a multiple of economic damages. The jury's award was slightly too high, but the court committed no error and there is no compelling evidence or argument that the excess in past medical damages unfairly prejudiced Ciolek's rights with regard to her noneconomic

---

services as a result of his lien). But these issues pertain to weight, not admissibility, and they were properly made the subject of cross-examination.

35

damages. (See, e.g., *Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1013-1014 [no prejudice at trial due to supposed erroneous admission of evidence of full amounts billed in case where lower amount was accepted as payment in full].)

## DISPOSITION

The judgment is modified to reduce the award of damages to Bermudez by $46,175.41 to $3,706,793.60. In all other respects, the judgment is affirmed. Ciolek's request for judicial notice is denied. Bermudez and Heacox shall recover from Ciolek costs incurred on appeal.



IKOLA, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.

36