Filed 8/16/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MALAK MELVIN ABDUL QAADIR, | B306011 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC656206) |
| v. | |
| UBALDO GURROLA FIGUEROA et al., | ORDER MODIFYING OPINION |
| Defendants and Appellants. | [No change in the judgment] |

IT IS ORDERED that the opinion filed in the above-captioned matter on August 11, 2021, be modified as follows:

1. On the cover page, the name Reid M. Ehrlich-Quinn should be added to the listing of counsel for Plaintiff and Respondent so that it reads:
"McElfish Law Firm, Raymond D. McElfish; Law Offices of Bob B. Khakshooy, Bob B. Khakshooy; The Ehrlich Law Firm, Jeffrey I. Ehrlich and Reid M. Ehrlich-Quinn for Plaintiff and Respondent."

This modification effects no change in the judgment.

_____
GRIMES, Acting P. J.          WILEY, J.          OHTA, J. *

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| MALAK MELVIN ABDUL QAADIR, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> UBALDO GURROLA FIGUEROA et al., <br><br> Defendants and Appellants. | B306011 <br><br> (Los Angeles County Super. Ct. No. BC656206) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Daniel S. Murphy, Judge.  Affirmed.

Cole Pedroza, Curtis A. Cole, Mathew S. Levinson, Susannah D. Dahlberg, Kenneth R. Pedroza; Poole Shaffery & Koegle, John H. Shaffery and Jason A. Benkner for Defendants and Appellants.

Tucker Ellis and Traci L. Shafroth for California Medical Association, California Dental Association, and California Hospital Association as Amicus Curiae on behalf of Defendants and Appellants.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Appellants.

Horvitz & Levy, Robert H. Wright and Steven S. Fleischman for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendants and Appellants.

Morgenstern Law Group, Robert A. Morgenstern and Ninos Saroukhanioff for The Trucking Industry Defense Association as Amicus Curiae on behalf of Defendants and Appellants.

McElfish Law Firm, Raymond D. McElfish; Law Offices of Bob B. Khakshooy, Bob B. Khakshooy; The Ehrlich Law Firm, and Jeffrey I. Ehrlich for Plaintiff and Respondent.

_____

Ubaldo Durrola Figueroa and Pacifica Trucks LLC (Defendants) appeal from a judgment awarding economic and noneconomic damages to Malak Melvin Abdul Qaadir in a personal injury suit arising from a traffic collision. Qaadir sought medical treatment for his injuries from lien providers who did not accept his insurance plan. The medical bills from the lien providers remained unpaid at the time of trial (unpaid medical bills).

Defendants[1] contend the trial court erred by: (1) admitting evidence of the full unpaid medical bills and the medical bills

---

[1]    In this appeal, four separate amicus briefs have been filed in favor of Defendants' position. We will only consider those arguments by amici which are raised by the parties on appeal and address them in conjunction with the parties' arguments.

2

paid by Qaadir's insurance plan to prove his past and future medical damages; (2) excluding testimony that Qaadir's attorney referred him to the lien providers; (3) precluding Defendants from arguing Qaadir failed to mitigate his damages when he chose providers who did not accept his medical insurance; (4) denying Defendants' motion for mistrial; and (5) denying their request for a continuance.  According to Defendants, these errors culminated in an excessive damages award.  We conclude none of these grounds warrant reversal and affirm the judgment.

## FACTS

On August 10, 2015, Qaadir was driving a truck for his employer when he was hit from behind by a tractor-trailer driven by Figueroa, who was employed by Pacifica Trucks.  Qaadir was travelling at approximately 10 to 15 miles per hour and Figueroa was travelling at approximately 45 miles per hour.  Both vehicles weighed about 33,000 pounds.

*The Medical Treatments*

Qaadir experienced leg and back pain the next day, which prompted him to seek medical treatment under his health insurance plan at the Kaiser South Bay Medical Center and

---

" 'As a general rule, issues not raised by the appealing parties may not be considered if raised for the first time by amici curiae. [Citations.]' " (*Mercury Casualty Co. v. Hertz Corp.* (1997) 59 Cal.App.4th 414, 425.)  "California courts refuse to consider arguments raised by amicus curiae when those arguments are not presented in the trial court, and are not urged by the parties on appeal.  ' "Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered [citations]." ' " (*California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1275; *Moore v. Mercer* (2016) 4 Cal.App.5th 424, 433–434.)

3

Health First Medical Group.  Approximately one month after the accident, Qaadir's personal injury attorney referred him to a pain management specialist, Dr. Hassan Badday.  Dr. Badday treated Qaadir at South Bay Pain Docs, where he also received chiropractic treatment and physical therapy.

From October 2015 to March 2016, Qaadir received epidural and facet-block injections to relieve his pain at Bay City Surgery Center.  None of the injections successfully alleviated the pain.  Qaadir ultimately underwent spinal-fusion surgery on July 25, 2016, which required the insertion of rods and screws into his back.  The surgery was performed by Dr. Fardad Mobin, a neurosurgeon, at Bay City Surgery Center.  Although the surgery helped Qaadir's leg pain, his back pain continued.

Qaadir's back pain led Dr. Mobin to refer him to Dr. Rostam Khoshar, another pain management specialist associated with Bay City Surgery Center.  After a fifth epidural injection in January 2018 failed to provide relief, Dr. Khoshar recommended a spinal cord stimulator be surgically implanted.  After a five-day trial, the spinal cord stimulator unit was permanently implanted in March 2018.  The surgery was performed at Bay City Surgery Center.  On July 15, 2019, Dr. Mobin performed a hardware removal and posterior fusion surgery at Bay City Surgery Center.

*The Trial on Damages*

Qaadir brought a negligence suit against Defendants on March 30, 2017.  Defendants admitted liability and the case proceeded to trial solely on the issue of damages.  Prior to trial, Defendants filed a motion in limine to exclude evidence of Qaadir's unpaid medical bills (MIL No. 6), which was denied.

At trial, Qaadir presented evidence of his full medical bills, both paid and unpaid.  Except for the medical services he initially

received under his health insurance at Kaiser and Health First, all of Qaadir's medical care was provided on a lien basis. At the time of trial, no payments had yet been made for the care he received from the lien providers. The total amount billed for Qaadir's medical care—including the treatment paid by his insurance—was $838,320.02.

Qaadir's billing expert opined the reasonable value of his medical bills totaled $632,456, using benchmark databases for medical services in the local geographical area. Qaadir's billing expert acknowledged he held an ownership interest in Bay City Surgery Center and had a "business relationship" with South Bay Pain Docs. The defense's billing expert opined the reasonable value of Qaadir's medical care was $174,111, based on an average of what private insurers, Medicare, and workers' compensation would agree to pay and medical providers would agree to receive for those services.

The jury returned a damages verdict totaling $3,464,288, comprised of past lost earnings of $282,288; past medical expenses of $532,000; future lost earnings of $900,000; future medical expenses of $500,000; past noneconomic loss of $500,000; and future noneconomic loss of $750,000. Judgment was entered for Qaadir and Defendants filed a motion for new trial, which the trial court denied. Defendants timely appealed.

## DISCUSSION

### I.     Admission of the Full Unpaid Medical Bills

Defendants contend the trial court erred when it admitted evidence of the full unpaid medical bills to prove Qaadir's past and future medical damages. We conclude the trial court abused its discretion to admit evidence of the full unpaid medical bills without first requiring Qaadir to demonstrate the evidence was

5

admissible because he actually incurred those amounts. However, we conclude the error was harmless.

### A.     Legal Principles

Admissibility of evidence depends on whether the evidence is material and relevant to a factual issue to be decided by the trier of fact.  As such, we begin by identifying the legal principles that ultimately govern what evidence is material and relevant.

In a tort action for economic damages, the California Supreme Court has held an award of past medical expenses is limited to the lesser of (1) the amount paid or incurred and (2) the reasonable value of the services rendered.  (*Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 556, (*Howell*).)

Prior to *Howell*'s publication, discussed *post*, a plaintiff seeking to prove past medical damages was generally permitted to introduce the billed amount for services rendered so long as there was independent evidence that the underlying medical procedures were necessitated by the alleged tortious act. (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1332 (*Bermudez*).)  *Howell* narrowed the circumstances under which such evidence is admissible.  It held evidence of the full billed amount is not relevant, and is therefore not admissible, to prove the past medical damages of an insured plaintiff if his or her insurer has pre-negotiated a lower rate as full payment for the services provided.  (*Howell, supra,* 52 Cal.4th at p. 567.)  After *Howell*, a split of authority arose regarding the circumstances under which the full billed amount is material and relevant to prove economic damages.

In *Pebley v. Santa Clara Organics, LLC* (2018) 22 Cal.App.5th 1266 (*Pebley*), the court held that when an insured

6

plaintiff chooses to seek medical care outside of his or her insurance plan, such a plaintiff may be considered "uninsured," making the incurred but unpaid medical bills potentially relevant to prove past and future medical damages—so long as additional evidence, usually in the form of expert opinion testimony, is also presented on the reasonable value of the services rendered. (*Id.* at p. 1269.) *Pebley* held, "when a plaintiff is not insured, medical bills are relevant and admissible to prove both the amount incurred and the reasonable value of the medical services provided." (*Id.* at p. 1275.)

By contrast, the court in *Ochoa v. Dorado* (2014) 228 Cal.App.4th 120 (*Ochoa*) held that evidence of "the full amount billed, but unpaid, for past medical services is not relevant to the reasonable value of services provided." (*Id.* at p. 135.) *Ochoa* went on to hold that "evidence of unpaid medical bills cannot support an award of damages for past medical expenses." (*Id.* at p. 139.) *Ochoa* thus categorically excludes evidence of unpaid medical bills.

Based on our reading of *Howell* and its progeny, we conclude evidence of a medical bill is relevant to prove or disprove the "paid or incurred" prong of past medical damages if it can be established the bill is actually paid or incurred. Thus, for a plaintiff such as Qaadir, evidence of his unpaid medical bills is relevant to his past medical damages only if he can show he actually incurred those amounts. Likewise, evidence of unpaid medical bills is relevant to prove or disprove the "reasonable value" prong of past medical damages if it can be shown the bill is actually incurred. If the full billed amount is not paid or incurred, *Howell* tells us it is not relevant to the issue of medical damages "for the simple reason that the injured plaintiff did not

7

[and will not] suffer any economic loss in that amount. [Citations.]" (*Howell, supra,* 52 Cal.4th at p. 548.)

## 1. Cases that Limit the Admissibility of the Full Amount Billed

### a. *Howell*

In *Howell*, the plaintiff in a motor vehicle collision received treatment from a medical provider through her health insurance which had pre-negotiated a discounted rate for the services she received that was lower than the billed amount. (*Howell, supra,* 52 Cal.4th at pp. 549–550.)

Prior to trial, the defendant moved to exclude the full billed amount "because only the amounts paid by plaintiff and her insurer could be recovered[.]" (*Howell, supra,* 52 Cal.4th at p.549.) The trial court denied the motion and allowed the full billed amount ($189,978.63) to be admitted. The jury ultimately awarded the full billed amount as past medical damages. (*Ibid.*) After the verdict was rendered, the defendant moved to reduce the past medical damages to the discounted rate actually paid by the insurer to the medical provider ($130,286.90), and the trial court granted the motion.

*Howell* framed the issue as follows: "In [the] circumstance [where the plaintiff's health insurer negotiates a discounted rate], may the injured person recover from the tortfeasor, as economic damages for past medical expenses, the undiscounted sum stated in the provider's bill but never paid by or on behalf of the injured person?" (*Howell, supra,* 52 Cal.4th at p. 548.)

Working from the rule that damages for past medical expenses are limited to the lesser of the amount paid or incurred and the reasonable value of the services, the plaintiff in *Howell* contended that she "*incurred* liability for the full amount of [the

8

medical providers'] bills when she signed patient agreements with those providers and accepted their services." (*Howell, supra*, 52 Cal.4th at p. 557.)

The *Howell* court was unpersuaded and noted, "Evidence presented at the posttrial hearing showed [the medical providers] accepted the discounted amounts as full payment pursuant to preexisting agreements with [the insurer], plaintiff's managed care plan. Since those agreements were in place when plaintiff sought medical care from the providers and signed the patient agreements, her prospective liability was limited to the amounts [the health insurer] had agreed to pay the providers for the services they were to render." (*Howell, supra,* 52 Cal.4th at p. 557.) As such, *Howell* held, "no . . . recovery [for the full billed amount] is allowed, for the simple reason that the injured plaintiff did not suffer any economic loss in that amount. [Citations.]"[2] (*Id.* at p. 548.)

On the question of whether the billed amount is relevant in a trial where the plaintiff's health insurer has pre-negotiated a discount for the procedure the plaintiff received, the *Howell* court noted, "Where the provider has, by prior agreement, accepted less

---

[2] In reaching this conclusion, *Howell* distinguished *Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288, 1295–1296 (*Katiuzhinsky*), which held evidence of the full amount billed was admissible to determine the reasonable value of past medical services because "the plaintiffs in that case, who apparently had no health insurance, remained fully liable to [the] medical providers for the full amount billed." *Howell* cited to *Katiuzhinsky* with approval, suggesting that a plaintiff's liability for the full amount billed was a critical factor to consider when deciding whether the full amount billed was relevant to determine past medical damages. (*Howell, supra*, 52 Cal.4th at pp. 554, 557.)

9

than a billed amount as full payment, evidence of the full billed amount is not itself relevant on the issue of past medical expenses." (*Howell, supra*, 52 Cal.4th at p. 567.)

*Howell* explained, "It follows from our holding that when a medical care provider has, by agreement with the plaintiff's private health insurer, accepted as full payment for the plaintiff's care *an amount less than the provider's full bill, evidence of that amount is relevant to prove the plaintiff's damages for past medical expenses* and, assuming it satisfies other rules of evidence, is admissible at trial." (*Howell, supra*, 52 Cal 4th at p. 567, italics added.)

In resolving the appeal, *Howell* also rejected the plaintiff's contention that under the collateral source rule,[3] limiting damages to the pre-negotiated amount gave a windfall to the defendant.  In analyzing whether the collateral source rule applied, the *Howell* court looked at the medical providers' business operations, noting its complex charging practices, e.g., the rise of managed care organizations and the shifting of costs by doctors and hospitals to "the uninsured, resulting in significant disparities between charges to uninsured patients and those with private insurance or public medical benefits. [Citation.]" (*Howell, supra,* 52 Cal.4th at p. 561.)  *Howell* noted that costs for services "can vary tremendously . . . from hospital

---

[3]     The collateral source rule prevents reduction of damages when a third party pays for some or all of a plaintiff's financial loss.  "Payments made to or benefits conferred on the injured party from other sources [i.e., those unconnected to the defendant] are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable." (Rest.2d Torts, § 920A, subd. (2).)

to hospital in California . . . making any broad generalization about the relationship between the value or cost of medical services and the amounts providers bill for them . . . perilous." (*Id*. at pp. 561–562, fn. omitted.)

The *Howell* court ultimately held, "The negotiated rate differential[4] lies outside the operation of the collateral source rule . . . because it is not primarily a benefit to the plaintiff and, to the extent it does benefit the plaintiff, it is not provided as 'compensation for [the plaintiff's] injuries.' [Citation.] Insurers and medical providers negotiate rates in pursuit of their own business interests, and the benefits of the bargains made accrue directly to the negotiating parties. The primary benefit of discounted rates for medical care goes to the payer of those rates—that is, in largest part, to the insurer." (*Howell, supra*, 52 Cal.4th at p. 564.)

While *Howell* discussed the billing disparities among health care providers in California, it did not rely on this reasoning to limit the past medical damages to the negotiated rate or limit the introduction of the full billed amount. The key that turned *Howell* is the dollar amount that fully satisfied the medical provider's services. Since the plaintiff's insurer pre-negotiated a lower amount that satisfied the medical provider in full, the plaintiff was not liable for the difference between the undiscounted amount in the bill and the pre-negotiated discount rate. As such, the full billed amount was deemed not relevant or admissible to prove past medical damages.

---

[4] The negotiated rate differential is "the difference between the providers' full billings and the amounts they have agreed to accept from a patient's insurer as full payment." (*Howell, supra,* 52 Cal.4th at p. 555.)

**b.** *Corenbaum*

*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1319 (*Corenbaum*) took *Howell* several steps further. Relying on the reasoning that the plaintiff may only recover the amount the medical provider accepts as full payment, *Corenbaum* held the billed amount for medical services when the insurer pre-negotiates a lower rate for services is inadmissible to prove not only past medical damages, but also future medical damages and noneconomic damages. (*Id.* at pp. 1330–1334.)

**c.** *Ochoa*

Next, *Ochoa* extended *Howell's* evidentiary limitation to all cases involving medical damages regardless of whether the insurer and the medical provider have pre-negotiated a lower rate than the billed amount.

Unlike *Howell,* which rested its holding on the actual amount that fully satisfied the medical provider for services rendered, *Ochoa,* quoting *Corenbaum,* instead focused on *Howell's* dicta regarding the widely divergent medical billing practices in California to conclude that evidence of the full amount billed is irrelevant to prove economic and noneconomic damages. (*Ochoa, supra*, 228 Cal.App.4th at pp. 135–136.) *Ochoa* acknowledged, "Although *Howell* did not expressly hold that unpaid medical bills are not evidence of the reasonable value of the services provided, it strongly suggested such a conclusion." (*Id.* at p. 135.)

Nonetheless, *Ochoa* held, "the full amount billed, but unpaid, for past medical services is not relevant to the reasonable value of the services provided. In our view, this rule is not limited to the circumstance where the medical providers had previously agreed to accept a lesser amount as full payment for

12

the services provided.  Instead, the observations in [*Howell*] and the reasoning in [*Corenbaum*], . . . compel the conclusion that the same rule applies equally in circumstances where there was no such prior agreement." (*Ochoa, supra,* 228 Cal.App.4th at pp. 135–136.)  Therefore, "evidence of unpaid medical bills cannot support an award of damages for past medical expenses." (*Id.* at pp. 138–139.)

*Ochoa* rests its holding on the "reasonable value" prong but failed to consider whether past medical damages can also be established by the "amount paid or incurred" prong.  *Ochoa* thus did not discuss whether unpaid medical bills are relevant to prove the "amount paid or incurred."

### 2. Cases That Permit Evidence of the Full Amount Billed

#### a. *Bermudez*

The plaintiff in *Bermudez* was uninsured.  (*Bermudez, supra,* 237 Cal.App.4th at p. 1324.)  As such, the issue of the pre-negotiated discount did not exist in *Bermudez*.  In assessing this difference with *Howell*, *Bermudez* reasoned, "the holding in *Howell* ultimately depended upon the 'paid or incurred' prong of the test, not the 'reasonable value' prong.  [Citation.]  Insured plaintiffs incur only the fee amount negotiated by their insurer, not the initial billed amount.  Insured plaintiffs may not recover more than their actual loss, i.e., the amount incurred and paid to settle their medical bills.  [Citation.]  It was not necessary in *Howell* to examine the mechanics of properly measuring damages in the case of an uninsured plaintiff." (*Bermudez, supra*, 237 Cal.App.4th at p. 1329.)

*Bermudez* further explained, "*Howell* certainly did not suggest uninsured plaintiffs are limited in their measure of

13

recovery to the typical amount incurred by an insured plaintiff, or, for that matter, the typical amount incurred by any other category of plaintiff. . . . *Howell* refused to 'suggest hospital bills always exceed the reasonable value of the services provided. . . . [Citation.]' " (*Bermudez, supra*, 237 Cal.App.4th at p. 1329.) *Howell* did not offer any "bright-line rule on how to determine 'reasonable value' when uninsured plaintiffs have incurred (but not paid) medical bills." (*Bermudez, supra*, at p. 1330.)

The *Bermudez* court concluded, "To be clear . . . neither [*Howell*] nor [*Corenbaum*] holds that billed amounts are inadmissible in cases involving uninsured plaintiffs. *Bermudez*'s uninsured status meant that billed amounts were relevant to the amount he incurred (unlike insured plaintiffs, who really only incur the lower amount negotiated by their insurer). The billed amounts are also relevant and admissible with regard to the reasonable value of Bermudez's medical expenses . . . ." (*Bermudez, supra*, at p. 1335.)

Additionally, the *Bermudez* court found its holding did not contradict *Ochoa*, which it interpreted to "[u]ncontroversially . . . hold[] that evidence of unpaid medical bills, without more, is not substantial evidence of *the reasonable value* of services provided." (*Bermudez, supra*, at p. 1337, italics added.)

**b.** *Pebley*

The court in *Pebley* extended *Bermudez*'s analysis to an insured plaintiff who chose to receive treatment from providers outside of his insurance plan. The court held "that such a plaintiff shall be considered uninsured, as opposed to insured, for the purpose of determining economic damages." (*Pebley, supra*, 22 Cal.App.5th at p. 1269.) The court explained it would be inequitable to classify the plaintiff, Pebley, as insured "when

14

Pebley, and not an insurance carrier, is responsible for the bills. Indeed, precluding Pebley from recovering the reasonable value of the services for which he is liable would result in both undercompensation for Pebley and a windfall for defendants." (*Id.* at pp. 1277–1278.)

The *Pebley* court rejected the defendant's argument the plaintiff failed to mitigate his damages by using providers who did not accept his insurance. It found "[a] tortfeasor cannot force a plaintiff to use his or her insurance to obtain medical treatment for injuries caused by the tortfeasor. That choice belongs to the plaintiff." (*Pebley, supra*, 22 Cal.App.5th at p. 1277.) If "the plaintiff chooses to be treated outside the available insurance plan, the plaintiff is in the same position as an uninsured plaintiff and should be classified as such under the law." (*Ibid.*) The court reasoned plaintiffs have multiple reasons to seek treatment outside of their insurance plan, including choosing specialists who do not accept their insurance or choosing doctors who may be more willing to participate in the litigation process. (*Ibid.*)

Applying *Bermudez*, the *Pebley* court held evidence of the full amount of the medical bills was admissible as relevant to prove both the amount incurred and the reasonable value of the services provided, so long as there was also expert testimony regarding the reasonable value of the services rendered. (*Pebley, supra*, 22 Cal.App.5th at pp. 1269, 1275.)

### 3.    Standard of Review

A trial court's conclusions of law are reviewed de novo. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 712.) Evidentiary rulings are reviewed for abuse of discretion. (*Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.) " 'The abuse

15

of discretion standard of review applies to any ruling by a trial court on the admissibility of evidence.' [Citation.] 'Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 919.)

### B. Analysis

### 1. Evidence of the Unpaid Medical Bills Is Relevant to the Issue of Past Medical Damages

#### a. *Pebley* Is Controlling

In denying Defendants' MIL No. 6, the trial court concluded that *Pebley* was controlling. We first determine whether this legal conclusion was correct.

Defendants assert *Pebley* does not control because it held unpaid medical bills were only relevant and admissible if "an expert [] can competently testify that the amount incurred and billed is the reasonable value of the service rendered . . . ." (*Pebley, supra,* 22 Cal.App.5th at p. 1275.) Stated differently, the full billed amount under *Pebley* is only admissible if the billed amount equals its reasonable value.

We see no reason to read such a limitation into *Pebley*. Indeed, such a limitation would completely ignore the reason why the billed amount is material and relevant to prove past medical damages—which is to prove "the amount paid or incurred."

Further, we observe no material distinction between Qaadir, an insured plaintiff who sought treatment outside of his insurance plan, and the plaintiff in *Pebley,* who did the same. We agree with *Pebley* that an insured plaintiff who opts to receive

16

medical treatment from outside of his insurance plan should be considered uninsured for purposes of proving past and future medical damages. This is because the plaintiff, rather than the health insurer, is the entity who is obligated to pay. As such, the trial court did not err in finding *Pebley* controlling.

**b.      Denial of MIL No. 6**

**i.  Qaadir Was Required to Establish He Incurred the Full Billed Amount to Demonstrate Its Admissibility**

As discussed above, evidence of unpaid medical bills may be relevant to prove or disprove both prongs of the medical damages calculation if it can be shown the bills were incurred. If the unpaid medical bills are not incurred, the injured plaintiff will not suffer economic loss in that amount. In short, the uninsured plaintiff's past medical damages are limited to his or her prospective liability for unpaid medical bills, i.e., the amounts he or she has incurred.

This is because evidence of the payment amount (i.e., the full billed amount, or, the reduced amount based on negotiation between the insurer and the medical provider) is clearly relevant to prove or disprove the first prong—whether the billed amount was "paid or incurred." Under *Howell*, this prong focuses on *the actual amount that fully satisfies the medical provider for services rendered*.[5] Thus, in cases where the plaintiff did not receive treatment through his or her health insurance plan and the bill

---

[5]      *Howell* explained, "when a medical care provider has, by agreement with the plaintiff's private health insurer, accepted as full payment for the plaintiff's care an amount less than the provider's full bill, evidence of that amount is relevant to prove the plaintiff's damages for past medical expenses[.]" (*Howell, supra*, 52 Cal.4th at p. 567.)

17

remains unpaid at trial, the question on whether the full medical bill is admissible turns on the amount for which the plaintiff is liable.  Just as in *Howell,* if the plaintiff did not actually pay or incur the full billed amount, evidence of the full medical bills "is not itself relevant on the issue of past medical expenses." (*Howell, supra*, 52 Cal.4th at p. 567.)

Our conclusion comports with California's statutory scheme for economic damages awards since the measure of damages recoverable in tort is "the amount which will compensate for all the detriment proximately caused" by the tort.  (Civ. Code, § 3333.)  The unpaid medical bill is a detriment proximately caused by the tort only if a plaintiff has incurred the full amount of the bill.  Thus, even in the scenario where the billed amount potentially exceeds its reasonable value, the billed amount is generally relevant because the plaintiff is financially liable for it. Our conclusion also comports with *Pebley,* which held an unpaid medical bill is relevant to prove economic damages for medical services when:  (1) the plaintiff is "uninsured," and (2) the "uninsured" plaintiff is obligated to pay the medical bill.  (*Pebley*, *supra*, 22 Cal.App.5th at pp. 1275–1278.)

### ii.  The Trial Court Erred But It Was Harmless

Our review of the record discloses the trial court neither asked nor determined whether Qaadir incurred the unpaid medical bills.  The trial court thus abused its discretion when it denied MIL No. 6 and allowed evidence of the unpaid medical bills to be admitted without first requiring Qaadir to proffer evidence of its admissibility:  that Qaadir was liable for that amount.

Nonetheless, we conclude any error was harmless. An evidentiary " 'error is not reversible unless " 'it is reasonably

18

probable a result more favorable to the appellant would have been reached absent the error.  [Citations.]'  [Citation.]" ' "  (*Lewis v. City of Benicia* (2014) 224 Cal.App.4th 1519, 1538; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  Given this record, we cannot say it is reasonably probable Defendants would have received a more favorable result absent the error.

At trial, Qaadir's expert opined the reasonable value of the medical services provided was $632,456.  He testified he arrived at this figure by using benchmark databases that set out the amounts that were charged and paid for the same medical services in the same geographical area.  By contrast, the defense's billing expert opined the reasonable value of Qaadir's medical care was $174,111, based on an average of what private insurers, Medicare, and workers' compensation would agree to pay and medical providers would agree to receive for those services.  The jury's past medical expenses award of $532,000 fell squarely within these two experts' valuations.

The record discloses the experts did not rely on evidence of the unpaid medical bills to reach their reasonable value determinations.  Indeed, Defendants recognize the unpaid medical bills "did not help the jury determine Plaintiff's past and future medical damages.  In other words, this evidence had 'very little effect on the issues.'  (See *Vorse v. Sarsay* (1997) 53 Cal.App.4th 998, 1008.)"  We agree and therefore conclude it is not reasonably likely Defendants would have received a more favorable outcome even if the trial court had excluded evidence of the unpaid medical bills.

Nonetheless, Defendants argue they were prejudiced because evidence of the unpaid bills " 'evoke[d] an emotional bias against' Defendants" and misled the jury to believe the damages

19

were greater than what was presented. We are not persuaded. Defendants fail to specify how the unpaid medical bills evoked "an emotional bias" from the jury over Qaadir's own testimony about his pain and suffering, including the "brutal" recovery from his surgeries, the changes to his lifestyle, and his inability to work at his chosen profession.

Defendants provide no compelling argument that the jury was misled to believe the damages were greater than what was presented since their award fell within the two experts' valuations. That the jury's award hewed closer to the plaintiff's expert's opinion does not conclusively show they were misled or confused by the inclusion of the unpaid medical bill evidence.

## 2. The Unpaid Medical Bills Were Not Used to Support Qaadir's Claim for Future Damages

Defendants contend evidence of the unpaid medical bills was irrelevant to a calculation of future medical damages. Qaadir agrees with Defendants; he asserts he did not rely on the unpaid medical bills to prove his future medical expenses.

The record shows Qaadir presented the testimony from Dr. Mobin, his treating physician, as to the future care he would require, including imaging studies of his spine, physical therapy and pain management, an additional fusion surgery, and a procedure to replace the battery in the spinal stimulator. A life care planning expert projected the cost of Qaadir's future medical needs using databases that report the fees charged by local providers for those services. The total cost was then reduced to present value. Qaadir's unpaid medical bills were not used to support his future medical damages claim.

Even if Qaadir's unpaid medical bills formed the basis to prove future medical damages, however, there was no error because *Pebley* held unpaid medical bills are relevant for

20

purposes of proving an uninsured plaintiff's past and future medical expenses.  (*Pebley, supra,* 22 Cal.App.5th at p. 1277.)

### 3.  No Prejudice Resulted From the Admission of the Bills Paid by the Insurance Plan

Defendants also contest the admission of the full amount of medical bills that were paid by Qaadir's insurer (the paid medical bills).  Relying on *Corenbaum*, Defendants contend evidence of the paid medical bills was inadmissible because it was irrelevant to the issue of past medical damages.  Further, admission of the paid medical bills prejudiced them because they artificially inflated Qaadir's damages.

We agree evidence of the paid medical bills was inadmissible to prove past medical damages under *Howell.* However, Defendants have failed to demonstrate they were prejudiced by the admission of that evidence.

At trial, both parties' experts prepared and presented to the jury spreadsheets which set out the amounts billed by Kaiser and First Health for Qaadir's initial treatments and the expert's determination of their reasonable value.  Qaadir's expert further set out what was paid on each bill.  The defense expert showed Health First and Kaiser billed a total of $5,137.24 for their services and opined the reasonable value of their services totaled $3,393.20.  Qaadir's expert presented similar, but different, total charges.  In particular, he showed $2,492.66 was paid for the Kaiser and Health First bills with one remaining unpaid bill from Kaiser of $413.  Aside from the unpaid $413 Kaiser bill, Qaadir's expert's "suggested reasonable cost/value" of the services provided by Kaiser and Health First equaled the amounts paid to them.  The jury ultimately awarded Qaadir $532,000 in past

21

medical damages, of which the Kaiser and Health First expenses represented a tiny fraction of those damages.

Given these facts, Defendants have failed to meet their burden to show prejudice resulted from the admission of the full amounts of the Health First and Kaiser medical bills. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 (*Pietak*) [appellant bears burden to demonstrate reversible error].) We decline to conclude the jury's award of $532,000 was artificially inflated in any meaningful way by the admission of evidence of paid medical bills totaling $5,137.24 when the plaintiff's expert testified the reasonable cost/value of those services equaled the amount paid of $2,492.66 and the defense expert testified the reasonable value of those services was $3,393.20.

## II. No Prejudice Resulted From the Exclusion of the Attorney Referral Evidence

Defendants contend the trial court committed prejudicial error when it excluded evidence that Qaadir's attorney referred him to the lien-physicians. Defendants assert the referral evidence was relevant to "how the amounts of the medical bills were set, i.e., [to] how the lien-physicians set their billed charges was influenced by the fact that the amount they recovered was directly linked to what Plaintiff recovered at trial." In short, Defendants contend the referral evidence was relevant to demonstrate the lien-physicians' incentive to inflate the bills.

We agree the referral evidence was relevant to the question of the reasonable value of the lien-physicians' medical care because it may show bias or financial incentives on the part of the lien-physicians. If a lien-physician wants future referrals from a lawyer and understands that the lawyer benefits from inflating a client's medical bills, that incentive might encourage

22

the lien-physician to inflate its current bill to please the lawyer and win future referrals.  (Evid. Code, §§ 210, 350.)  During his opening statement defense counsel advised the jury, without objection, that Qaadir was "directed to go see Dr. Badday by his lawyer."  Subsequently, defense counsel asked Qaadir's billing expert and Qaadir himself whether his attorney referred him to the lien-physicians.  Plaintiff's counsel objected on relevance grounds, and the objection was sustained both times.  Ultimately, the trial court never ascertained the relevance of defense counsel's questions by either granting a side bar conference, or, permitting defense counsel at a recess to proffer its relevance.[6]  This was error.

Defendants, however, fail to demonstrate prejudice resulted from the error.  At trial, defense counsel ably explored the lien-physicians' incentive to inflate their bills due to the nature of the liens.  The jury was advised Dr. Mobin, Qaadir's treating physician, and others at Bay City Surgery and South Bay Pain Docs provided medical care on a lien basis.  At closing, defense counsel highlighted Dr. Mobin's and Bay City Surgery's charges "in excess of $600,000 on a lien" and questioned whether there was bias from this.  Defense counsel also cross-examined Dr. Morris, Qaadir's billing expert, on his role at South Bay Surgical Center and his business relationship with South Bay Pain Docs.  At closing, he argued Dr. Morris had an incentive to overstate the reasonable value of the services rendered due to his connection with the lien providers.  Although not evidence (*McIntyre v. The Colonies Pacific, LLC* (2014) 228 Cal.App.4th 664, 674), defense counsel's opening statement and question to Dr. Mobin also

---

[6]     After the trial court sustained the objection during Qaadir's cross examination, defense counsel requested to approach the bench and the trial court denied the request.

alerted the jury to the potential that Qaadir was referred to the lien-physicians by his attorney. As a result, the jury was aware of "how the lien-physicians set their billed charges was influenced by the fact that the amount they recovered was directly linked to what Plaintiff recovered at trial."

## III. The Trial Court Did Not Err When It Precluded Evidence of Mitigation

Despite conceding that "[i]t is undisputedly the insured plaintiff's *choice* to see a lien-physician" and that they "do not argue that an insured plaintiff must use his insurance-covered medical providers[,]" Defendants contend they should have been allowed to present evidence Qaadir chose to receive treatment outside of his insurance. According to Defendants, this evidence would have allowed the jury to consider whether he reasonably mitigated his damages.

### 1. Defendants have waived the mitigation of damages issue.

Qaadir argues Defendants have waived the mitigation of damages issue. We agree. During trial, Qaadir filed a motion in limine, citing to *Pebley,* to exclude evidence of his health insurance status. The trial court agreed that under *Pebley,* "you cannot use private insurance for mitigation damages." It asked defense counsel to proffer the evidence he wanted to admit and explain its relevance. Defense counsel explained he wanted to clarify testimony by Qaadir's billing expert that the Kaiser and Health First payments were made through a contractual agreement. He stated, "I don't want to talk about workers' comp. I don't even want to use the word 'insurance.' I have no intention of doing that." After further argument, the trial court ruled, "I'm going to allow that. Once again, it cannot be argued for

24

mitigation damages. There can't be any argument that he should have gone to Kaiser, but it's fair game to ask him about Kaiser being contracted." Defense counsel responded, "I have no issue with that, your Honor."

Defendants assert their trial counsel's statements were an acknowledgment of the trial court's ruling and not a waiver of the mitigation of damages issue. We disagree.

Defense counsel never indicated he wished to argue or present evidence that Qaadir failed to mitigate his damages by using lien providers rather than providers covered by his insurance. Instead, defense counsel's statement "I have no issue with that, your Honor" was an express waiver of the mitigation of damages argument. (*Sperber v. Robinson* (1994) 26 Cal.App.4th 736, 742–743.) Defendants may not now "change [their] position and adopt a new and different theory on appeal." (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874.)

We also reject Defendants' assertion that their objection during closing arguments and their motion for new trial preserved the issue. The objection and new trial motion, discussed *post*, related to a perceived statement by plaintiff's counsel that Qaadir *did not* have health insurance, not that he *did* have health insurance but declined to use it.

## 2. There is no legal authority to support Defendants' mitigation of damages argument.

Even if it was not waived, we find Defendants' argument to be unavailing. Evidence of a plaintiff's insured status under these circumstances is properly excluded to avert confusion of the issues, or to prevent misleading or prejudicing the jury. (*Pebley, supra,* 22 Cal.App.5th at p. 1278; Evid. Code, § 352.)

25

Defendants present no authority for the proposition that Qaadir was required to mitigate his damages by seeking care only within his insurance plan. Instead, it is undisputed he had a right to seek treatment outside of his insurance plan. " 'The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights.' [Citation.]" (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.) Whether Qaadir could have reasonably mitigated his damages by using providers under his insurance plan instead of the lien providers was simply not at issue.[7]

Our analysis conforms with *Pebley*'s rejection of a similar mitigation of damages argument. Defendants contend *Pebley* was wrongly decided because it allows a plaintiff to present a legal fiction to the jury that he is uninsured rather than insured. This argument is without merit. *Pebley* does not permit a plaintiff to misrepresent his insurance status to a jury. Indeed, *Pebley* found the trial court did not abuse its discretion when it excluded evidence of the plaintiff's insurance status. (*Pebley, supra,* 22 Cal.App.5th at p. 1278.) Instead, *Pebley* merely held an insured plaintiff who receives treatment outside of his insurance plan "is to be considered uninsured (or noninsured) for purposes of proving the amount of his damages for past and future medical expenses." (*Id.* at p. 1277.) That is, he may prove the reasonable

---

[7] We note the trial court did not entirely preclude Defendants from making a mitigation of damages argument. Indeed, the trial court gave the general mitigation of damages instruction for personal injury as well as for past and future lost earnings.

26

value of the services he received by admission of the unpaid medical bills and by expert testimony.

## IV. The Trial Court Did Not Abuse Its Discretion When It Denied the Motion for Mistrial

Defendants next contend reversal is warranted because the trial court prejudicially erred when it denied their motion for mistrial. We disagree.

### A. Proceedings Below

During his testimony, the defense billing expert explained that to determine the reasonable value of a given medical service, he looked at the amounts that various insurance plans, Medicare, and workers' compensation paid for such a service. During cross-examination, plaintiff's counsel asked the following:

"Q. . . . This is the quid pro quo of this case is the provider gets benefits in return for certain pay schedules, true?

A. True.

Q. And then the member, who's the person who gets the services, like everyday people, they get the benefit of having doctors to choose from that will accept those payments. You agree?

A. I do.

Q. You have to be a member to get that quo part of the quid pro, right?

A. Membership has its privileges."

Outside the presence of the jury, defense counsel argued that plaintiff's counsel was getting close to "painting a picture in the jurors' minds that Mr. Qaadir did not have insurance, and therefore looking at any analysis with insurance [was] unfair." The trial court disagreed, finding, "he hasn't implied that his client has or does not have insurance. He just is arguing that

27

your expert didn't consider the non-insurance issue model." In any case, the court interpreted *Pebley* and *Ochoa* to hold "whether somebody has insurance or doesn't have insurance is really not relevant as to what the reasonable value is."

During his rebuttal closing argument, plaintiff's counsel argued, "Membership has its privileges. Of course it does if you're in the plan. There's no evidence of that." Plaintiff's counsel later referred to the defense expert as "Mr. membership has its privileges." Defense counsel moved for a mistrial outside of the jury's presence on the ground plaintiff's counsel implied Qaadir was uninsured. Defense counsel argued plaintiff's counsel's argument opened the door to the issue of insurance, warranting a mistrial. According to defense counsel, he would have presented a different damages scenario if the trial court had not precluded him from presenting evidence Qaadir was insured.

The trial court denied the motion. It found "the evidence that was presented was clearly that . . . there's different payments if somebody has insurance versus if someone doesn't have insurance . . . and the difference[s] are reasonable, and I think he was fairly commenting on that, not directing that the plaintiff—specifically about the plaintiff's situation. More about how the expert went about determining his numbers."

### B. Analysis

We review a denial of a motion for mistrial for abuse of discretion. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1248.) "[T]he trial judge, present on the scene, is obviously the best judge of whether any error was so *prejudicial to one of the parties* as to warrant scrapping proceedings up to that point." (*Blumenthal v. Superior Court* (2006) 137 Cal.App.4th 672, 678.) "The fundamental idea of a mistrial is that some *error* has

28

occurred which is too serious to be corrected, and therefore the trial must be terminated, so that proceedings can begin again. [Citation.]" (*Ibid.*)

Taken in context, the record shows the trial court's characterization of counsel's rebuttal argument was accurate; counsel's statements did not indicate to the jury that his client did not have insurance but were comments directed to the defense expert's testimony. Accordingly, there was no error, much less prejudicial error sufficient to justify terminating the trial and beginning anew.

V. **The Trial Court Did Not Abuse Its Discretion When It Denied a Request for an Indefinite Trial Continuance**

Defendants argue the trial court abused its discretion when it denied their motion for a continuance to allow time for their expert to recover from heart surgery or to retain a new expert. We are not persuaded.

A. **Proceedings Below**

During voir dire on January 7, 2020, Defendants were informed their vocational rehabilitation expert, Gene Bruno, would be "unavailable to testify until at least March" because he was suffering from complications as a result of recent heart bypass surgery. Defense counsel was informed of Bruno's surgery in early December after the final status conference and after they had confirmed his availability. At that time, they were assured he would still be able to testify in January. Defense counsel first learned of Bruno's complications on January 7, and requested a trial continuance that day. He acknowledged he was "told it will be at least March, without any definitive commitment

29

as to when he's going to be available." Defense counsel estimated Bruno was 70 to 80 years old.

Defense counsel described Bruno as the defense's "most important witness" regarding future lost earnings, of which Qaadir claimed over $1,000,000 in damages. He expected Bruno to testify about whether Qaadir could have returned to work earlier and, if so, in what capacity. Bruno would also opine that Qaadir's future lost earnings totaled $60,000. Plaintiff's counsel opposed a continuance, suggesting Defendants could present Bruno's videotaped deposition at trial. Counsel informed the court that Bruno's deposition was taken after Qaadir's vocational rehabilitation expert was deposed, so he had the opportunity to rebut the other expert's testimony.

The trial court denied the continuance on the ground Bruno affirmed he had offered his full and complete opinions at the deposition. Further, Bruno was precluded from offering any new opinions at trial under *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 920. As a result, Defendants would not be unduly prejudiced by use of the videotaped deposition instead of live testimony. At trial, Defendants read portions of Bruno's deposition testimony. Plaintiff played portions of Bruno's deposition videotape.

### B. Legal Principles

California Rules of Court, rule 3.1332 (rule 3.1332), governs motions for continuance of a trial and cautions: "To ensure the prompt disposition of civil cases, the dates assigned for a trial are firm. All parties and their counsel must regard the date set for trial as certain." (Rule 3.1332(a).) Trial continuances are "disfavored," and "[t]he court may grant a continuance only on an affirmative showing of good cause requiring the continuance."

(Rule 3.1332(c).)  The unavailability of an essential expert witness due to illness may be an indication of good cause.  (Rule 3.1332(c).)

The trial court must consider all relevant facts and circumstances surrounding the continuance, including: "[t]he proximity of the trial date" (rule 3.1332(d)(1)); "[t]he length of the continuance requested" (rule 3.1332(d)(3)); "[t]he availability of alternative means to address the problem that gave rise to the motion or application for a continuance" (rule 3.1332(d)(4)); "[t]he prejudice that parties or witnesses will suffer as a result of the continuance" (rule 3.1332(d)(5)); and "[w]hether the interests of justice are best served by a continuance, by the trial of the matter, or by imposing conditions on the continuance" (rule 3.1332(d)(10)).

"When a continuance is sought to secure the attendance of a witness, the defendant must establish 'he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 (*Jenkins*).)

We review the denial of a motion to continue the trial date for abuse of discretion.  (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881–882.)

**C. Analysis**

Given the guidelines specified in rule 3.1332 and *Jenkins*, we conclude the trial court did not abuse its discretion when it denied Defendants' request for a trial continuance.  The trial court properly considered the burden an open-ended continuance

31

would place upon the parties, witnesses, jurors, and the court, particularly when the trial had already begun. It concluded little or no prejudice would result from a denial of the continuance because Bruno's deposition testimony, which set forth his full and complete opinions, could be presented in place of his live testimony.

Defendants assert they were deprived of a fair hearing because the discovery deposition was not a substitute for live testimony. Defendants, however, fail to point to any testimony that Bruno could have presented "live" that was not included in his deposition. Neither are we persuaded by the cases cited by Defendants for the proposition that testimony given through a video or by a reader are disfavored forms of testimony because it does not allow the trier of fact the same ability to judge credibility as live testimony does. (*DiRienzo v. Philip Services Corp.* (2nd Cir. 2002) 294 F.3d 21, 30; *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358; *Meiner v. Ford Motor Co.* (1971) 17 Cal.App.3d 127, 140–141.) None of these cases hold that a trial court abuses its discretion to deny an open-ended continuance to allow an expert witness, whose deposition testimony has been videotaped and who has presented his full and complete opinions in the deposition, to testify at trial. Given these circumstances, Defendants fail to show the trial court abused its discretion in denying their request for continuance or that the denial was prejudicial. (*Pietak, supra,* 90 Cal.App.4th at p. 610.)

Defendants cite *Pham v. Nguyen* (1997) 54 Cal.App.4th 11 (*Pham*), for the proposition that a trial court abuses its discretion as a matter of law when it denies a trial continuance when an expert is "unavailable because of an 'unavoidable' emergency." (*Id*. at p. 18.) *Pham* is inapplicable because it relied on the rule

32

specified in section 9 of the Standards of Judicial Administration, which had provided that "the necessity for the continuance should have resulted from an emergency occurring after the trial setting conference that could not have been anticipated or avoided with reasonable diligence and cannot now be properly provided for other than by the granting of a continuance." (Former Cal. Stds. Jud. Admin. § 9, repealed Jan. 1, 2004.) The Judicial Council repealed section 9 in 2004 and it does not apply to this matter. (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1399.) Instead, as we set out above, the trial court properly relied on the guidance provided by rule 3.1332 to craft an alternative means for Defendants to present Bruno's opinions to the jury.

We are similarly not persuaded by *Jurado v. Toys "R" Us, Inc.* (1993) 12 Cal.App.4th 1615 (*Jurado*) to find prejudicial error. In *Jurado,* the plaintiff's treating physician ignored a properly-served subpoena and was unavailable to testify at trial because he was in Europe. Before trial began, the plaintiff moved for a brief continuance or placement on the master calendar court's trailing calendar. The request was denied. Without a medical witness to testify to the plaintiff's injuries in a slip and fall claim, the case was dismissed. (*Id.* at p. 1617.) The appellate court reversed, holding "there were other less drastic and more appropriate means to redress the situation and the trial court's refusal to trail the case for a few days was an abuse of discretion." (*Id.* at p. 1620.)

Notwithstanding that *Jurado* also relied on repealed section 9 of the Standards of Judicial Administration, it is distinguishable on its facts. The *Jurado* plaintiff requested a "brief" continuance before trial, not an open-ended one after trial

33

had begun as Defendants did. Moreover, unlike Bruno's videotaped deposition, there was no indication an alternative means of presenting the medical testimony was available to the plaintiff in *Jurado*.

In their reply brief, Defendants assert they alternatively sought a continuance to retain another expert to testify in Bruno's place. We reject this argument for the same reasons: trial had already begun; this was an indefinite continuance because there was no indication when Defendants might be able to retain a new expert, much less how much time it would take for that expert to become familiar with the facts of the case and to be deposed; and a reasonable alternative to presenting Bruno's live testimony existed.

## VII. Defendants Have Failed to Show the Jury's Damages Award Suggested Passion, Prejudice, or Corruption

Defendants next argue the jury's damages award of more than three million dollars was excessive. In particular, Defendants contend the cumulative effect of the trial court's errors, including admission of evidence of the unpaid medical bills and plaintiff's counsel's purported claim to the jury that Qaadir lacked insurance, resulted in an excessive economic damages award. The excessive economic damages award, in turn, resulted in an excessive noneconomic damages award. Additionally, Defendants contend Bruno's absence from trial resulted in an excessive award for future loss of earnings. We are not persuaded.

### A. Legal Principles

" 'The amount of damages is a fact question, first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear

34

the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom.  As a result, all presumptions are in favor of the decision of the trial court [citation].  The power of the appellate court differs materially from that of the trial court in passing on this question.  An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' " (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 299 (*Breg*) quoting *Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506–507 (*Seffert*).)

In making this assessment, the court may consider, in addition to the amount of the award, indications in the record that the fact finder was influenced by improper considerations, including inflammatory evidence, misleading jury instructions, improper argument by counsel, or other misconduct.  (*Breg, supra,* 7 Cal.App.5th at p. 299.)

**B.  Analysis**

Here, Defendants assert the trial court's various purported errors led to excessive economic and noneconomic damages awards.  Where we have determined error occurred—in admitting evidence of the unpaid medical bills without first requiring Qaadir to lay the foundation for its admissibility and admitting evidence of the paid medical bills—we have concluded those errors were harmless.  As to the remaining issues raised by Defendants, we have determined the trial court did not err and thus, the jury could not have been influenced by improper argument by counsel, erroneous exclusion of evidence,

inflammatory evidence, or other misconduct because none of those errors occurred.

In any event, Defendants focus on evidence that would support a result that is contrary to what the jury found. The standard of review, however, requires us to do the opposite: "In considering the contention that the damages are excessive the appellate court must determine every conflict in the evidence in respondent's favor, and must give him the benefit of every inference reasonably to be drawn from the record [citation]." (*Seffert*, *supra*, 56 Cal.2d at p. 508.)

Here, the record shows the jury awarded damages which fell between Qaadir's and Defendants' experts' calculations. For past medical expenses, the jury awarded $532,000, which was $100,000 less than Qaadir's expert's opinion of the "reasonable value" of the services and approximately $350,000 over the defense expert's valuation. For future medical damages, the jury awarded $500,000, which was $200,000 less than Qaadir's valuation and almost $100,000 over the defense's valuation.

We cannot say the jury's past medical damages awards shocked the conscience given the extensive medical treatment required to treat Qaadir's injuries, including spinal fusion surgery, the installation of a spinal-cord stimulator, and hardware removal and posterior fusion surgery. Neither did the future medical damages award suggest "passion, prejudice, or corruption" on the part of the jury given the testimony from Dr. Mobin that Qaadir will require additional surgeries, imaging studies, physical therapy, and ongoing care in the future.

We reach the same conclusion with respect to the jury's award of $900,000 for future lost earnings. Defendants argue

their inability to present Bruno's "live" testimony led the jury to disregard his deposition testimony entirely. This is rank speculation and we need not further entertain this baseless theory.

Defendants also contend the future lost earnings award was not supported by the evidence. To the contrary, the record shows Qaadir presented testimony from a vocational-rehabilitation expert that Qaadir would never work as a truck driver again and was limited to office-based clerical work in the future at a much lower salary. Qaadir's economist calculated the present value of his future loss of earnings to be $972,392. That is substantial evidence to support the jury's award of $900,000. We reject Defendants' efforts to reargue the evidence and have us reach a conclusion contrary to the jury's findings. (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 [appellate courts do no reweigh evidence or reassess the credibility of witnesses].)

## DISPOSITION

The judgment is affirmed. Qaadir to recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**


OHTA, J. *

We Concur:



GRIMES, Acting P. J.          WILEY, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

37